## Julie A. Boisvert v. Ronald and Sheila Harrington

[796 A.2d 1102]

No. 99-523

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed January 25, 2002

*Mary Welford*, Manchester, for Plaintiff-Appellant.

*Jonathan M. Cohen*, Bennington, for Defendants-Appellees.

**Skoglund, J.** Mother Julie A. Boisvert appeals from an order of the superior court denying her motion to terminate a guardianship over her minor son, Kelsey Harrington, and ordering an evidentiary hearing on the issue. Mother contends: (1) the guardianship was freely revocable and, therefore, the court erred in ordering an evidentiary hearing; and (2) the court violated her constitutional rights as a parent, and her constitutional right to due process. We affirm.

This case concerns a twelve year old boy whose grandparents have served as his court-ordered guardians since he was thirteen months old. The underlying facts are not well developed because the matter was appealed before an evidentiary hearing, as ordered by the probate and superior courts, could occur. Certain facts, however, are undisputed. The child was born in November 1988. Mother was not married to the child's father and he has since died. In January 1990, mother petitioned the probate court to appoint her mother and step-father, Sheila and Ronald Harrington, as guardians for the boy. Finding that a transfer of custody was "in the best interest of the child," the court granted the petition. In 1996, mother was incarcerated for two months. Since that time, the boy has resided primarily with the Harringtons, and has not had contact with mother since August 1997. Mother acknowledges that after her release from prison, she abducted the minor and was charged with custodial interference.

We note, as well, the extensive probate court record in this case (which we may judicially notice) which contains numerous status reports and two psychological evaluations by a court-appointed clinical psychologist, one submitted to the court in January 1998 and a second in August 1999. These records evidence a high level of family conflict and a troubled relationship between the minor and mother, resulting in a court order requiring that visits between the minor and mother be supervised.

In February 1999, mother moved again to terminate the guardianship. She argued that because she had consented to the guardianship under 14 V.S.A. § 2645(4), it should be freely revocable without the necessity of an evidentiary hearing or any showing that

revocation was in the best interests of the minor.[1] The probate court ruled that termination of the guardianship was governed by 14 V.S.A. § 3003 and § 3004, which require a hearing to determine if the parent is then the proper person to have care and custody of the child.[2] The probate court thus denied the request for automatic revocation and ordered an evidentiary hearing. Mother appealed to the superior court, which upheld the decision of the probate court, ruling that the probate court has "inherent authority over a guardianship created under its authority . . . regardless if the guardianship was a voluntary or involuntary one." The court concluded that the original guardianship order had found mother to be "unsuitable," and thus the hearing procedures for terminating a guardianship under § 3003 and § 3004 were appropriate. This appeal followed.

Before we address the merits of the appeal, we clarify the basis for our jurisdiction. Following its decision, the superior court remanded the case to the probate court to conduct an evidentiary hearing. Thus, there is no final judgment in the case because that decision did not resolve the controversy between the parties. See *Huddleston v. Univ. of Vt.*, 168 Vt. 249, 251, 719 A.2d 415, 417 (1998). Under these circumstances, mother's proper recourse should have been to request permission to take an interlocutory appeal pursuant to V.R.A.P. 5(b), which she failed to do. According to V.R.A.P. 2, however, we have discretion to suspend "application of Rule 5 where dismissal would most likely result in another appeal after remand, the merits of the question of law were fully briefed and argued, and the Court has expended valuable time on the case." *In re Smith*, 169 Vt. 162, 167, 730 A.2d 605, 609 (1999). Given that these requirements have been met in this case, we entertain this appeal under V.R.A.P. 2.

In denying mother's request to revoke the guardianship, the lower courts based their decisions on their interpretation of Vermont's guardianship statutes. There are five statutory devices for creating a guardianship:

---

[1] As discussed more fully below, § 2645(4) provides for appointment of a guardian for a minor "[w]hen no parent objects and transfer of custody is in the best interest of the minor."

[2] Section 3003 provides that when, "by reason of the incompetency or unsuitableness of a parent," another person has been appointed guardian, the parent may at any time file a motion for removal of the guardian, and the court shall schedule a hearing on the matter. Section 3004 provides that the court may revoke the guardianship if, after hearing, it is "of the opinion that the parent is then a proper person to have the care and custody of the child."

(1) When the minor has no parent living authorized to act as guardian; or

(2) When the parent is under guardianship or shown to be incompetent or unsuitable to have the custody of the person of the minor; or

(3) When the parent of the minor resides without the state and has so resided for three years and has not contributed to the minor's support during such time . . .; or

(4) When no parent objects and transfer of custody is in the best interest of the minor . . .; or

(5) When the minor has a parent living and the minor is the owner of real or personal property.

14 V.S.A. § 2645.[3]

There are also express statutory provisions for the termination of a guardianship issued under § 2645(2) (when the parent is shown to be "incompetent or unsuitable"), see 14 V.S.A. §§ 3003, 3004, but the statutes are silent on the termination of court-ordered guardianships under 14 V.S.A. § 2645(4) ("[w]hen no parent objects and transfer of custody is in the best interest of the minor"). This tells us little in itself. Prior to the enactment of § 2645(4) in 1982, see 1981, No. 153 (Adj. Sess.), § 1, the statute contained only the equivalent of § 2645(2) for the appointment of guardians in cases of parental incompetence or unsuitableness, and the revocation statute not surprisingly addressed only this circumstance. When § 2645(4) was added, the Legislature failed to adopt a parallel amendment establishing procedures or standards for revocation of guardianships established under the new provision.

■ The omission does not, however, leave us entirely without legislative guidance. As noted, prior to the addition of § 2645(4) to the guardianship statute, it contained a provision for appointment of a

---

[3] Although the lower courts construed the guardianship order in this case to create a guardianship under § 2645(2) (when the parent is shown to be "incompetent or unsuitable"), this conclusion is unsupported by the record, which shows that it was created under § 2645(4) (when "no parent objects and transfer of custody is in the best interest of the minor"). The superior court relied on a finding of the probate court in its 1990 order, which stated: "The mother is presently unable to provide adequate and proper care." The court construed this to represent a finding that mother was an "unsuitable parent" under § 2645(2), although the probate court never used this language. The guardianship petition was brought under § 2645(4), and the court's express finding that a transfer of custody was "in the best interest of the child" compels the conclusion that the petition was granted on the basis in which it was brought.

guardian upon a showing that the parent was incompetent or unsuitable, and a parallel provision for revocation of the guardianship if, after a hearing, the court "is of the opinion that the parent is then a proper person to have the care and custody of the child." 14 V.S.A. § 3004. Having provided for a hearing on the merits of revocation when the parent has been found "incompetent or unsuitable" under § 2645(2), it is reasonable to assume that the Legislature intended a similar hearing when custody was transferred in the "best interest of the minor" under § 2645(4). In either case, revocation would be contingent upon a finding, after hearing, that the circumstances which precipitated the transfer of custody no longer obtained.

Mother emphasizes the statutory requirement that she not "object" to the guardianship under § 2645(4), a requirement not present under § 2645(2). This alone does not suggest that she may revoke the guardianship at her whim. The statute *also* requires a finding that the transfer of custody be in the "best interest of the minor." It stands to reason that, in revisiting its previous ruling, a court should be persuaded that the guardianship is *no longer* in the child's best interest. Certainly this appears to be more consistent with the legislative scheme than automatic revocation.

It is also more consistent with child custody and guardianship law as a whole. It is fundamental that the state's paramount and indefeasible duty in custody determinations is to safeguard the welfare of the child. As we explained in *Paquette v. Paquette*, 146 Vt. 83, 90, 499 A.2d 23, 28-29 (1985):

> The courts of this state have long recognized that, even in those early days when custody of a child was viewed as a form of property right, "the natural right of the father to the custody of his child cannot be treated as an absolute property right, but rather as a trust reposed in the father by the state as *parens patriae* for the welfare of the infant."

*Id.* (quoting *Bioni v. Haselton*, 99 Vt. 453, 457, 134 A. 606, 607 (1926)).

Nowhere is this more evident than in the guardianship context. In this, as in most states, the probate court essentially exercises a continuing jurisdiction over both the guardian and the ward, and may suspend the guardian for a failure to perform his or her statutory duties. See 14 V.S.A. § 3011 (when guardian fails to perform duties, court may suspend guardian and appoint special fiduciary). Indeed, in appointing a guardian *the court* assumes the primary

responsibility to protect the minor or others who are unable to care for themselves. "In reality the court is the guardian; an individual who is given that title is merely an agent or arm of that tribunal in carrying out its sacred responsibility." *Kicherer v. Kicherer*, 400 A.2d 1097, 1100 (Md. 1979); see also *In re Carstens' Guardianship*, 37 N.W.2d 581, 584 (Neb. 1949) (guardian is "an officer of the court," which enjoys "broad judicial discretion in the matter of removal or refusal to remove a guardian"); *Clendenning v. McCall*, 60 N.E.2d 676, 681 (Ohio 1945) ("A guardian is an officer of the court appointing him. . . . A guardian appointed by a court . . . is always under the court's control and is subject to its directions and supervision."). Thus, interpreting the statute to divest the court of its plenary authority to continue or revoke a guardianship — and place that authority instead in the parent who was removed from custody — would represent a fundamental break with traditional common law principles. See *Swett v. Haig's, Inc.*, 164 Vt. 1, 5, 663 A.2d 930, 932 (1995) (statutory language of uncertain meaning will not be construed to change or abrogate common law rules).

Mother cites no authority to support the concept of a "freely revocable" guardianship, nor has our research disclosed any case law or statutes embodying such a scheme. On the contrary, while the cases uniformly acknowledge a presumption in favor of parental custody, all recognize that the presumption may be overcome through an evidentiary showing that continuation of the guardianship remains in the child's best interest. In *In re Guardianship of Williams*, 869 P.2d 661 (Kan. 1994), for example, the trial court not only held an evidentiary hearing on the mother's petition to terminate the guardianship over her son, but took "considerable testimony" on the respective parenting abilities of the mother and the guardian, and denied termination of the petition. *Id.* at 663. Although the Kansas Supreme Court ruled that the trial court had erred in failing to apply a parental preference, there was no suggestion by the court that the mother was entitled to automatic revocation. Similarly, in *In re Guardianship of R.B.*, 619 N.E.2d 952, 955 (Ind. Ct. App. 1993), the trial court made specific findings that demonstrated "ample support for the decision . . . that it was in R.B.'s best interest to be in [his mother's] custody." The governing statute provided that a court may terminate a guardianship if the guardianship is "no longer necessary for any reason." *Id.* at 954. "Because sufficient evidence was presented to the effect the

guardianship was no longer necessary," the statute was satisfied. *Id.* In *In re Guardianship of Stewart*, 369 N.W.2d 820, 824 (Iowa 1985), the court observed that the parental preference doctrine was not the "controlling factor." Rather, "[a]s in all child custody matters the first and governing consideration must be the best interest of the affected child." *Id.*

In all of these cases, the courts recognized certain fundamental principles: that the proper inquiry in a termination of guardianship proceeding is the best interests of the minor; that there is a presumption the minor's best interests lie with parental custody; and that the burden is on the party opposing revocation to overcome this presumption. None, however, supports the proposition that the guardianship is "freely revocable" at the will of the parent. On the contrary, to recognize these principles is to acknowledge that they must apply in some evidentiary setting in which the nonparent carries the burden. This precludes, by definition, the concept of revocation at will.

Moreover, the parental preference doctrine is only that — a preference — an advantage given to parents over other persons. It does not answer the question of what is in the child's best interest.

> The day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude.

*Bennett v. Jeffreys*, 356 N.E.2d 277, 281 (N.Y. 1976) (quoted with approval in *Paquette v. Paquette*, 146 Vt. at 88-89, 499 A.2d at 28).

Finally, mother suggests that an inquiry into the minor's best interests would violate her parental or due process rights because there is no assurance that the initial guardianship proceeding was accompanied by adequate procedural safeguards. See *Rutherford v.*

*Best*, 139 Vt. 56, 63, 421 A.2d 1303, 1307 (1980) (when probate proceeding is used to separate parent and child, "fundamental fairness requires that an adequate record be prepared and that the probate judge make findings, so that on appeal to this Court, we can determine whether the record supports the findings and whether the findings support the judgment"). The answer to this concern is simply for probate courts in § 2645(4) guardianship proceedings to ensure that the parents are aware of their rights, and that an adequate record and findings are prepared. Although the record of the initial guardianship proceeding in this case was apparently not available for review, it is undisputed that the probate court made an express finding that the guardianship was in the best interests of the minor, and there is no indication that the finding was unsupported by the evidence or that mother was denied due process. See *State v. Brown*, 165 Vt. 79, 87, 676 A.2d 350, 355 (1996) ("presumption of regularity" attaches to prior judicial proceedings).

 The right to care for one's children is a fundamental liberty interest, recognized and protected by this and the United States Supreme Court. See *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Rutherford*, 139 Vt. at 60, 421 A.2d at 1306. Thus, a parent who seeks to revoke a guardianship under § 2645(4) enjoys a presumption that his or her custody is in the child's best interest. However, nothing in our constitutional or statutory scheme, the common law, or general practice supports the proposition that the guardianship is terminable at will. Where, as here, the current guardians and the minor's court-appointed attorney oppose revocation, the court must be free to order an evidentiary hearing to determine whether granting the petition is in the best interests of the child.[4]

---

[4] Where the guardians choose not to oppose revocation, but the circumstances otherwise raise concerns about the welfare of the child, the court may appoint counsel for the child and a guardian ad litem — if they have not been previously appointed — to investigate the circumstances, and may then determine whether an evidentiary hearing is necessary. See V.R.F.P. 6(c)(2) (authorizing appointments by probate court). The mere fact that the guardians acquiesce in the parental petition to revoke does not, however, compel the court to grant the petition. As noted, the court retains inherent authority over guardianships created under its auspices, and the ultimate responsibility to ensure that revocation is in the child's best interests. That responsibility cannot be delegated to the current guardians, or to anyone else.

This decision does no violence to the parental preference doctrine; it does not grant guardians greater rights than a natural parent.[5] What it does, is recognize that when a petition for guardianship was brought before it, a court of law agreed with a natural parent and made a determination that the child would be better off with someone other than the parent as guardian. The court then assumed primary responsibility for the child. The dissent's approach would permit a parent who relinquished guardianship of their child to revoke the court's order transferring guardianship and resume their role as parent without any evaluation by the court of what this change might do to the child's well-being or best interests. This denigrates the role of the probate court and reduces its determinations to a mere piece of paper.

*Affirmed.*

**Johnson, J.,** concurring in part and dissenting in part. A child may not be kept from his parent by a nonparent unless the parent has been determined to be unfit. Although the majority agrees that there has been no finding of unfitness in this case, it holds that a mother who voluntarily relinquished her son to her parents at a time when she was unable, not unfit, to care for him may not have the child back without proving that the change of custody is in the best interests of the child. In so holding, the majority has ignored recent Vermont precedent holding to the contrary and has fashioned a standard for terminating a voluntary guardianship that ignores mother's fundamental right to a relationship with her child, as protected by the due process clause. U.S. Const. amend. V. Accordingly, I concur in the judgment remanding the matter for a hearing, but I respectfully dissent from the majority's best interests standard.

## I.

The majority paints a version of the facts in this case on the basis of its judicial notice of the probate court record, inferring a high level of family conflict and a troubled relationship between the minor and mother, based on the number of docket entries and two psychological

---

[5] And it, in no way, disturbs our holding or rationale in *In re S.B.L.*, 150 Vt. 294, 553 A.2d 1078 (1988), as suggested by the dissent. *In re S.B.L.* was an initial custody dispute between the father of a child born out of wedlock and a grandparent. What is at issue here is the assertion by a parent that she may unilaterally revoke or overturn a probate court's decision, an issue not presented in *In re S.B.L.*

reports in the file. The implication from this discussion, which has no relevance to the legal issue at hand, is that mother was unfit when the voluntary guardianship was created or is unfit now. Because we all agree this was a voluntary guardianship, however, we have no evidence to judge why mother entered into it. If we were to fill in the story with mother's version of the facts from her appellate brief, a different picture emerges.

Mother, age 19, and son Kelsey lived with mother's parents after Kelsey's birth in 1988. Mother petitioned the probate court to have the guardianship established in 1990. Mother then married Gaston Boisvert, and mother and Kelsey moved out of the grandparents' house and lived with Gaston Boisvert as a family, although Kelsey continued to visit his grandparents on weekends. This arrangement continued until February of 1996 when Mrs. Boisvert was incarcerated for 60 days. At that time, Kelsey was seven years old. When she was released, she attempted to resume custody of Kelsey. Apparently, her parents objected, and Mrs. Boisvert was charged with custodial interference because she refused to return Kelsey to his grandparents. Since that time, Kelsey has lived with his grandparents, and visits with mother had to be set up through the probate court. Mother alleges that the grandparents were uncooperative with the visits.

In an attempt to regain custody, mother filed a pro se petition to terminate the guardianship in April of 1996. The court refused to terminate the guardianship on the ground that it was not in the child's best interest. The next two and one-half years, as mother alleges, were "consumed" with her attempts to maintain contact with her son. On February 11, 1999, with the assistance of counsel, she moved to terminate the guardianship once again, which eventually resulted in the appeal we have before us.

If we were to accept mother's version of the story, we might infer that mother, at age 19 and hardly emancipated, was pressured to create the guardianship by her parents, and that any conflict between mother and minor does not result from mother's unfitness, but has been created by the grandparents' intentional interference in that relationship. But, I do not begin to suggest that we accept either the majority's inferences from the facts or the facts according to mother's brief. I present them to emphasize why, when two very different scenarios can be reasonably inferred from this case, we should not be speculating about the facts, but dealing with mother's

legal status. That legal status is that mother entered into a voluntary guardianship, and that she has not been determined in any court of law to be an unfit parent.

## II.

The right to care for one's children is a fundamental liberty interest that has long been protected by both the United States Supreme Court and this Court. See *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest . . . of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court."). In *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), the United States Supreme Court reaffirmed the Court's historical recognition of parents' fundamental liberty interest in the care, custody and management of their children, even when they have not been model parents or have lost temporary custody of their child to the state. The Court held that parents were entitled to a clear and convincing evidence standard of proof when the termination of their parental rights were at stake. It relied on a series of decisions holding that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment" to the Constitution of the United States. *Id.* See *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981); *Moore v. East Cleveland*, 431 U.S. 494, 499-500 (1977); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). See also *M.L.B. v. S.L.J.*, 519 U.S. 102, 119-20 (1996); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942).

In recognition of the fundamental nature of the underlying rights, the Court has given other procedural due process protections to the termination of those rights. It held in *Stanley* that the Due Process Clause of the Fourteenth Amendment prevents the state from presuming the unfitness of an unwed father. 405 U.S. at 657. Therefore, a hearing is required before children may be taken from such a parent. *Id.* In *M.L.B.*, 519 U.S. at 120, the Court held unconstitutional a state statute requiring an indigent parent in a termination proceeding to pay record preparation fees in advance of filing an appeal from an adverse determination. It noted the Court's unanimous view that " 'few consequences of judicial action are so

grave as the severance of natural family ties.'" 519 U.S. at 119 (quoting *Santosky*, 455 U.S. at 787 (Rehnquist, J., dissenting)).

Relying in part on *Stanley*, we have held that any hearing under the involuntary guardianship statute, 14 V.S.A. § 2645(2), must contain full procedural safeguards attendant to a proceeding that implicates such fundamental interests. *Rutherford v. Best*, 139 Vt. 56, 62-63, 421 A.2d 1303, 1307 (1980). Furthermore, the substantive showing required to prove a parent unsuitable is considerable. In *Rutherford*, we established that proving a parent "unsuitable" required a showing that "the child has been abandoned or abused by the parent, or that the child is without proper parental care or subsistence, education, medical, or other care necessary for his well-being." *Id.* at 61, 421 A.2d at 1306.[1]

In this case, it is beyond dispute that none of the procedural or substantive hurdles required by the Constitution for separating a child from his mother because of parental unfitness were met at the original guardianship hearing in 1990 because the guardianship was voluntary.[2] Therefore, the question for decision is how mother, a fit parent, terminates a voluntary guardianship and assumes custody of her son.

There is no statutory procedure to terminate a voluntary guardianship, that is, a guardianship *not* based on the unfitness of

---

[1] As there was no transcript of the hearing, we must rely on the only findings of the court available for review. The one sentence in the 1990 order that mother is "unable to provide adequate and proper care" is not sufficient to prove she is "unsuitable" according to the *Rutherford* factors. The 1990 order contains no discussion of mother's living circumstances, her employment, her interactions with her son, or anything else that would support the superior court's assertion that mother is "unsuitable." Without inquiry into "the character, conditions, habits, and surroundings" of the parent, there can be no finding that mother is unsuitable. *Rutherford*, 139 Vt. at 61, 421 A.2d at 1306 (internal citation omitted).

[2] Indeed, all submissions by the parties indicate that no procedural safeguards were followed. As we stated in *Rutherford*:

> [W]hen a probate proceeding is used as a vehicle to separate parent and child, it loses its informality. At that point, fundamental fairness requires that an adequate record be prepared and that the probate judge make findings, so that on appeal to this Court, we can determine whether the record supports the findings and whether the findings support the judgment.

139 Vt. at 63, 421 A.2d at 1307.

the parent.[3] The majority concludes from this gap in the statutes that the Legislature must have intended that a parent petitioning to terminate a *voluntary* guardianship should be required to prove not only that she is a fit parent, but that the transfer of custody is in the child's best interest. It reaches this conclusion by rewriting the guardianship statute and erasing any distinctions the Legislature has actually expressed between types of guardianships. See 14 V.S.A. § 2645(1)-(5) (subsections creating separate guardianships for different situations).[4]

As a matter of statutory construction, the majority opinion goes too far. It has fashioned an entirely new statute that cannot be justified under any view of our powers to interpret and effectuate the Legislature's intent. It is sometimes necessary for courts to imply a statutory term where the statute is deficient, but the term supplied must be more than "advantageous or convenient" to the major power conferred, and it is "never permitted to contradict the act" involved. N. Sutherland, Statutes and Statutory Construction § 55:03, at 386 (6th ed. 2000); see *In re United Mo. Bank of Kansas City*, 901 F.2d 1449, 1457 (8th Cir. 1990). But that error pales in significance to the fact that the majority has created a statute that is unconstitutional. See *In re S.B.L.*, 150 Vt. 294, 305, 553 A.2d 1078, 1085 (1988) (parent's due process rights require that he be determined to be unfit in contest with third party nonparent); *In re Guardianship of Williams*, 869 P.2d 661, 665-66 (Kan. 1994) (citing prior decision in *Sheppard v. Sheppard*, 630 P.2d 1121 (Kan. 1981), *cert. denied*, 455 U.S. 919 (1982)), holding unconstitutional Kansas statute that permitted nonparent, with consent of a legal custodian after divorce, to disregard the parental preference doctrine and obtain legal custody). The majority's newly created statute is unconstitutional

---

[3] Section 3003 of Title 14 provides: "When, *by reason of the incompetency or unsuitableness* of a parent to have the custody and education of a minor child, another person has been appointed guardian of the minor, the parent may, at any time, file a motion for the removal of the guardian." (Emphasis added.) The statute also states that "[t]he court shall schedule a hearing" to determine if the guardianship should be revoked. 14 V.S.A. § 3003. At the hearing, the court may terminate the guardianship if it believes that the parent is the "proper person to have the care and custody of the child." *Id.* § 3004.

[4] Because the majority's analysis obfuscates any functional distinction between guardianships, the majority's holding that the lower court erred when it held the guardianship was involuntary is meaningless. If there is no significance to the difference in guardianships, there should be no error attributed to the trial court.

because it takes *no* account of mother's constitutional right to raise her child, and it completely overlooks our decision in *S.B.L.*

In *S.B.L.*, we decided the crux of the issue in this case — how the constitutional right of a parent to a custodial relationship with her child is protected in a contest between the parent and a third party who seeks guardianship of the child. There, we concluded that "granting guardianship to a third person in preference to a parent who has demonstrated a commitment to parenthood based solely on a judicial determination of the best interests of the child — *without first requiring the third party to demonstrate that the parent is unfit* — denies the natural parent due process of law." 150 Vt. at 305, 553 A.2d at 1085 (emphasis added). In *S.B.L.*, a biological father of a child born out of wedlock sought custody from S.B.L.'s grandfather after the death of the child's mother in an automobile accident. Because he was not married to S.B.L.'s mother, the father was unable to take advantage of a statute, 14 V.S.A. § 2641, declaring the father and mother, if competent, the joint guardians of a "legitimate minor child." On the basis of this statute, this Court would have held that biological parenthood, without more, did not provide the father with the rights of a parent under the guardianship statute, 14 V.S.A. § 2645, and therefore the father had no greater right to the child than the grandparent. But the facts in *S.B.L.* demonstrated that the father had lived with the child and his mother for the first six months of the child's life. In view of his "demonstrated commitment" to the child, under the holding in *Lehr v. Robertson*, 463 U.S. 248 (1983) (unwed father must demonstrate commitment to child to obtain due process protection of relationship), we recognized the father's fundamental right to the care and custody of his child as against a third party, including a grandparent. *S.B.L.*, 150 Vt. at 305, 553 A.2d at 1085. Therefore, because the father was fit, his rights were primary to the grandfather's, and we affirmed the award of custody.

The decision in *S.B.L.* reflected the recent developments in constitutional law defining the rights of fathers of children born out of wedlock. *Id.* at 303, 553 A.2d at 1084. Therefore, the language in the *S.B.L.* holding requiring a "demonstrated commitment" to parenthood was the bridge, under *Lehr*, to give the same rights to the unwed father in *S.B.L.* that mothers have long enjoyed under the common law and the Constitution. *Id.* at 305, 553 A.2d at 1085. In the case at bar, however, no demonstrated commitment to the child is necessary for the mother to invoke her constitutional right to raise

her child. As we noted in *S.B.L.*, we must apply a "constitutional gloss" to our interpretation of the guardianship statutes, 150 Vt. at 306, 553 A.2d at 1086, and therefore a third party guardian may not be appointed for the child under § 2645 without proof of the requisite grounds under the standard adopted in *Rutherford v. Best*, i.e., substantial proof of unfitness.

Not surprisingly, the right of parents to custody of their own children versus grandparents to whom children have been voluntarily and temporarily relinquished is a familiar scenario. Several states are in accord with our decision in *S.B.L.*[5] In *Williams*, 869 P.2d at 670, the Kansas Supreme Court held that a mother who had not been found unfit was not required to show that a change of custody would materially promote the welfare of her minor child before she could regain custody. The mother was entitled to the application of the parental preference doctrine, which incorporates the unfitness standard, such that when the custody dispute is between a parent and a third person, the parent prevails unless unfit. *Id.* at 669. The *Williams* decision was based on a previous decision of the Kansas court in *Sheppard*, 630 P.2d 1121, which provided persuasive authority for *S.B.L.*, holding unconstitutional a Kansas statute that permitted any person having actual physical custody of a child with the consent of the legal custodian to be awarded custody, notwithstanding the parental preference doctrine. In striking down the statute, the Kansas court held:

> [T]hat a parent who is not found to be unfit, has a fundamental right, protected by the Due Process Clause of the United States Constitution, to the care, custody and control of his or her child, and that the right of such a parent to custody of the child cannot be taken away in favor of a third person, absent a finding of unfitness on the part of the parent.

*Sheppard*, 630 P.2d at 1128.

In a recent decision by the Florida Supreme Court, *Richardson v. Richardson*, 766 So. 2d 1036 (Fla. 2000), the court struck down a statute providing that where a child is residing with a grandparent, a

---

[5] Although the majority claims not to overrule *S.B.L.*, it adopts a best interests standard that is inconsistent with that decision. There was no determination below that the child was "better off" with someone other than the parent. Therefore, mother retains her status as a fit parent until proven otherwise.

court may recognize grandparents as having the same standing as parents for evaluating what custody arrangements are in the best interests of the child. The court held the statute was unconstitutional because it equated grandparents with parents based solely on a best interests standard, thereby interfering with a natural parent's fundamental right to rear his or her child. *Id.* at 1039-40. See also *In re Guardianship of Stewart*, 369 N.W.2d 820, 823 (Iowa 1985) (father who had voluntarily relinquished custody of his daughter to her maternal grandparents custody retained a presumptive right to custody that grandparents bore the burden of overcoming); *Bezio v. Patenaude*, 410 N.E.2d 1207, 1214 (Mass. 1980) (whether parents make informal arrangements for the custody of their children or use the formal guardianship process "[n]atural parents should be denied custody only if they are unfit"); *In re Ruth J. v. Beaudoin*, 389 N.Y.S.2d 473 (App. Div. 1976) (mother who had voluntarily relinquished her daughter to the care and custody of the state did not have to prove she was then fit to take care of her child or to show that the return of the child from foster care was in the child's best interests in order to obtain custody). See Annotation, *Award of Custody of Child Where Contest is Between Child's Mother and Grandparent*, 29 A.L.R.3d 366 (Supp. 2001) (citing numerous cases for the rule that mother is entitled to custody of child absent unfitness, abandonment, or extraordinary circumstances).

Thus the best interests standard proposed by the majority vests rights in the guardians to the guardianship where these rights simply do not exist. See *Barstad v. Frazier*, 348 N.W.2d 479, 482 (Wis. 1984) ("the 'best interests of the child' is not the proper standard in custody disputes between a natural parent and a third party").[6] A guardianship is, by its nature, a temporary arrangement, and the guardians are caring for the ward in place of the court. The majority's standard would require the court to find that there is something currently undesirable about the guardianship for the child, not just that mother is a fit parent. In fact, this imposes a more rigorous standard than that statutorily required to terminate an

---

[6] Additionally, it is disingenuous for the majority to claim that mother does not bear the burden of proof to meet this standard. As a practical matter, an inquiry into the child's best interest necessitates mother to present evidence of her own suitability as a parent, *even though she was not deemed unfit*. The best interest standard also forces mother to compare herself to the guardians (i.e. home, income, marital status, etc.), and convince the court that she is the better parent than the guardians. I cannot see how an inquiry into the best interest of the child does not place the burden of proof on mother.

involuntary guardianship created under § 2645(2). According to 14 V.S.A. § 3004, a parent who has previously been found unsuitable may regain custody of her child by proving that the parent is "then a proper person to have the care and custody of the child." This standard properly focuses the court's inquiry on the parent, not on the merits of the guardianship, which is irrelevant. It should not be more difficult for a mother who has never been found to be unfit to regain custody of her child than it is for a mother from whom a child has been taken away.

In the case at bar, no amount of interpretation or inference about the Legislature's intent permits us to override the mother's constitutional rights. As a practical matter, however, mother has to file a petition to terminate the guardianship to remove the court order that controls custody. Because the guardians object to the petition, a hearing will be held by the probate court. The guardians are free to file their own petition alleging that the mother is unfit. At the hearing on their petition, the guardians should have the burden of proof to prove unfitness.

The majority addresses one other issue, and although it is unlikely to surface in this case in view of the objection of the guardians, it is important to address the termination of a voluntary guardianship when there is no objection or counter-petition filed. If that were the case here, the majority would still not return the child to the mother without a showing by her that resumption of custody is in the best interests of the child. In other words, the majority finds that the guardianship is not freely revocable. This view is irreconcilable with mother's constitutional rights, for the same reasons as outlined above, because it treats mother as if she has been adjudged unsuitable when she has not, and it is inconsistent with our precedent on parental preference.

The parental preference doctrine to which we have adhered in Vermont for years is based on the notion that "[t]here is a presumption that the natural affection of a parent for a child will insure the faithful execution of the trust which he holds as natural guardian." *Bioni v. Haselton*, 99 Vt. 453, 458, 134 A. 606, 608 (1926). More recently, in *S.B.L.*, we recognized "a presumption that it is in the best interests of the child to grant custody to a natural parent." 150 Vt. at 299, 553 A.2d at 1082. This presumption is rebuttable, however, by clear and convincing evidence that the natural parent is unfit or that extraordinary circumstances justify denying the natural

parent custody. *Paquette v. Paquette*, 146 Vt. 83, 92, 499 A.2d 23, 30 (1985). Proper application of the parental preference doctrine also incorporates the unfitness standard necessary to implement the parent's constitutional right to parent. Therefore, if no one with standing objects or comes forward to show that the natural parent is unfit, the presumption is not rebutted, and the parent is entitled to the return of the child. Under these circumstances, the guardianship is freely revocable. This is hardly "tearing up" the court order, since court action is required in any case.

The majority's reluctance to implement the parent's rights may stem from a fear that an unfit parent who entered into a voluntary guardianship may seek to revoke that guardianship and the guardian will not object, thereby endangering the child. See 173 Vt. at 292 n.4, 796 A.2d at 1108 n.4. I am not suggesting that the court cannot hold a hearing on a petition to revoke and seek to understand the setting into which the child will be placed, but the court is without power to deny the petition unless it finds by clear and convincing evidence that the parent, is unfit.

I am authorized to state that Justice Dooley joins this dissent.

