# IN THE SUPREME COURT OF IOWA

No. 20–1034

Submitted October 20, 2021—Filed January 14, 2022

**IN THE MATTER OF THE GUARDIANSHIP OF L.Y.**

**G.Y.** and **K.Y.,**

      Appellants,

vs.

**S.W.,**

      Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Story County, Stephen A. Owens, District Associate Judge.

A mother seeks further review of a court of appeals decision reversing the juvenile court's order terminating the guardianship of her minor child. **DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Andrew B. Howie (argued) of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellants.

Dani L. Eisentrager (argued) of Eisentrager Law Office, Eagle Grove, for appellee.

Frank C. Tenuta of Iowa Legal Aid, Sioux City, and Ericka Petersen (argued) of Iowa Legal Aid, Iowa City, for amicus curiae B.M.R.

F.D. Chip Baltimore, II, (argued) of the Law Office of Kirke C. Quinn, Boone, for amicus curiae The Iowa Guardianship and Conservatorship Association.

**CHRISTENSEN, Chief Justice.**

On January 1, 2020, a new guardianship act went into effect in Iowa. This case requires us to interpret that act for the first time. Specifically, we must determine where the burden of proof is allocated and what must be shown when a parent requests termination of a guardianship of a minor child that was established with parental consent. This case also requires us to consider whether the fundamental liberty interests of parents in the care, custody, and control of their children survive the repeal of a statutory presumption favoring parental custody.

Young parents consented to a temporary guardianship for the paternal grandparents to serve as guardians of their almost five-year-old daughter so that she could be placed on the grandparents' medical insurance and easily travel with them on vacation without issues. The guardianship also provided an opportunity for the parents to finalize their divorce and establish stability in their lives. Having achieved that stability, Mom sought to terminate the guardianship. Requiring Mom to prove by a preponderance of the evidence that the guardianship should be terminated, the juvenile court concluded that burden was met and the child's long-term interests warranted terminating the guardianship and returning the child to Mom's custody.

The court of appeals reversed the juvenile court's termination order based on its interpretation of the relatively new guardianship act, concluding the act prevented the court from applying a previously codified statutory preference favoring parents over all others in guardianship proceedings. On further review,

we vacate the court of appeals decision and affirm the judgment of the juvenile court terminating the guardianship, but we do so under slightly different reasoning based on our interpretation of the new guardianship act. While the court of appeals is correct that the new guardianship act repealed the statutory presumption favoring parental custody, parents still have fundamental liberty interests in the care, custody, and control of their children that establish a rebuttable preference in their favor over all others in guardianship proceedings.

When a parent who has not been adjudicated unfit files a motion to terminate a guardianship established with parental consent under Iowa Code section 232D.203 (2020), the juvenile court must start with the rebuttable presumption that the child's best interests are served by reuniting the minor child with their parent. The guardian must then prove by clear and convincing evidence that the guardianship should continue because "termination of the guardianship would be harmful to the minor and the minor's interest in continuation of the guardianship outweighs the interest of a parent of the minor in the termination of the guardianship." *Id.* § 232D.503. If the guardian fails to meet that burden, the guardianship must be terminated as requested by the moving parent.

## I. Background Facts and Proceedings.

At sixteen years old in May 2009, Mom gave birth to L.Y. Initially, L.Y. stayed with Mom, who lived with her parents in Webster City, for four days and then with Dad, who lived with his parents in Story City, for three days each week. After Mom graduated high school in 2010, she and L.Y. moved in with Dad and

L.Y.'s paternal grandparents. In February 2011, L.Y.'s parents married and continued to live with the paternal grandparents until the parents moved out with L.Y. in July 2013. The parents separated shortly thereafter in September, and L.Y. returned to living with her paternal grandparents, where Mom would see her on the weekends.

In February 2014, the parents consented to a guardianship with the paternal grandparents serving as L.Y.'s guardians so that the child could be placed on their medical insurance and they could travel together to Arizona on vacation without any issues. Additionally, the guardianship allowed the parents to finalize their divorce and work on getting their separate lives in order. Following a hearing on March 31, the district court appointed the paternal grandparents as co-guardians of L.Y., who was almost five years old at the time. The parents' divorce was not officially finalized until January 2016, and their divorce decree was silent on the issues of custody and visitation for either parent. Instead, the decree simply stated, "[E]ach party desires that the guardianship be continued at the present time. The guardianship shall continue."

Following the parents' separation and the implementation of the guardianship, Mom went to live with her mother and was employed at a cellular phone company, which ultimately gave her the experience she needed to obtain her current position as a 911 dispatcher for Wright County. Mom continued to have contact with L.Y. through phone calls, weekend visits, and a weeklong visit during the summertime. At various times since the guardianship was implemented in February 2014, Mom sought help terminating the guardianship.

She attempted to seek legal counsel in 2015 and 2017. However, the attorney she consulted with in 2015 advised her to go elsewhere, and she could not afford to hire the attorney she consulted in 2017.

In 2018, Mom wrote the paternal grandparents a letter requesting termination of the guardianship to which they never responded. On another occasion, she texted Dad and paternal grandmother about ending the guardianship, which also did not result in a discussion on the issue. Mom never raised the issue with the guardians in person and nothing changed. With the financial assistance of her family to cover legal fees, Mom hired legal counsel to initiate proceedings to terminate the guardianship of now eleven-year-old L.Y. in June 2020. Mom has now lived in the same single-family home with her boyfriend in Woolstock for at least the past three years, where she has a bedroom for L.Y, and believes she is ready and able to parent L.Y.

At Mom's nomination, the court appointed attorney Mark Olberding as the court visitor.[1] Olberding interviewed Mom, the guardians, L.Y., and Dr. Judy Rudman—L.Y.'s therapist—and recommended the guardianship continue. In doing so, he reasoned L.Y wanted the guardianship to continue, the guardians have been her caregivers for the majority of her life, and the guardianship

---

[1]Iowa Code section 232D.305(3) governs the court visitor's duties, which include explaining the proceedings to the child and interviewing the child, the parents, and guardians. The court visitor must submit a written report to the district court that contains "[a] recommendation regarding the appropriateness of a guardianship for the minor"; "the qualifications of the guardian together with a statement of whether the minor has expressed agreement with the appointment of the proposed guardian"; and a discussion of any other matters the court requests or that "the court visitor deems relevant to the petition for guardianship and the best interests of the minor." *Id.* at § 232D.305(4).

provides L.Y. with "a sense of stability and place" in contrast to the "inconsistent" visitation between L.Y. and her parents.

The juvenile court held a hearing on the mother's motion to terminate the guardianship on July 23. Mom testified that she thought the guardianship was created "under temporary terms . . . and it was for [paternal grandparents] to take medical action if needed, along with going out of state on vacation." She explained she "repeatedly asked if it was temporary" when she was asked to sign the paperwork, and "[paternal grandfather] confirmed that it was."

Mom discussed the difficulties she experienced trying to exercise visitation time with L.Y. because of L.Y.'s other commitments and weekend plans arranged by the guardians. Mom acknowledged she had not attended any school conferences or many medical appointments for L.Y., defending these absences by explaining that the guardians did not keep her informed of the appointments so that she could attend. She also expressed feeling intimidated by the guardians, stating, "[A]t times I don't feel like I can voice what I would like to see with [L.Y.] . . . They just kind of shut me down, I guess." Mom was open about the depression and anxiety she has experienced, much of this due to the guardianship situation, but she declared she has it under control and continues to see a counselor.

Mom testified that she would like the guardianship terminated because she is now in the position to provide for L.Y. financially and emotionally. Mom claimed L.Y. has told her she wants to live with her and cries when she has to return to the guardians. Nevertheless, Mom recognized the bond L.Y. has with

the guardians and the anxiety that termination could cause L.Y. She stated she would want L.Y. to continue counseling if the guardianship was terminated and to continue to spend time with the guardians and that side of the family to ease the transition.

Dad testified that he now lives in Eldora, is gainfully employed, has remarried, and has other children. He tries to have L.Y. with him "at least once every other weekend or, you know, like same as [L.Y.'s Mom]," but he acknowledged that his contact with L.Y. "could be more" and that he attends "very few" of L.Y.'s doctor appointments, dentist appointments, and school conferences. Dad admitted he has gone "maybe a month, month and a half" without having contact with L.Y. at times due to "neglect on [his] part" when he was "busy with the fire department and work and didn't have [his] priorities straight at that time." When asked how he has contributed to L.Y. financially, Dad stated that he "will buy her clothes or some supplies for school," despite making around $70,000 per year and stating that he is financially stable. He supports the continuation of the guardianship because he believes it is in "[L.Y.]'s best interests to stay where she is at." Although Mom is the only parent seeking termination of the guardianship, Dad declared he intended to seek full custody of L.Y. if the guardianship was terminated.

Both guardians testified, though paternal grandmother's testimony was more substantial. She explained they considered a guardianship initially "so that I could get [L.Y.] on my insurance so we had medical care for her and so that we could travel." She did not personally talk to L.Y.'s parents about the

guardianship when they were considering it, explaining she thought paternal grandfather "maybe discussed [it] with them and then we went to get things drawn up." Paternal grandmother confirmed she does deny the parents visitation if the guardians have "other things planned" for L.Y. and admitted she stopped notifying them of L.Y.'s medical appointments because "[m]any times if they were told in the beginning, they didn't come." The guardians each expressed concerns about Mom's mental stability due to Mom's depression and anxiety and felt it was in L.Y.'s best interests for the guardianship to continue.

L.Y.'s therapist, Dr. Judy Rudman, testified that she has been working with L.Y. for the past two years due to L.Y.'s anxiety and "some perfectionistic tendencies." She noted L.Y. was struggling with the inconsistency of the visitation with her parents "and feeling the need to be perfect and really please them so that they would want to spend more time with her." Dr. Rudman stated L.Y. "was happy that her mom wanted her and made her feel valued and loved" when she talked about Mom seeking custody, but she was also "unsure why her mom was asking for sole custody when they didn't really have a consistent visitation in [L.Y.]'s eyes."

L.Y. told Dr. Rudman she wanted to stay with her guardians, and Dr. Rudman testified that "from a therapeutic standpoint, . . . it would be best to keep [L.Y.] in her current environment." However, she admitted she had no background information on Mom. When asked if L.Y. would be able to make a move and cope with the termination, Dr. Rudman stated,

> Ultimately, I think [L.Y.] is resilient and children in general are resilient, and she has a lot of people that love her, but I think it

> would be pretty rocky and pretty rough. . . . I would have concerns especially because, like you were saying and we were both saying, [L.Y.] has a tendency to please so if she were in distress I would have concerns that she might not share with her mom so she would just need extra attention and lots of eyes on her to make sure she was stable and dealing with the transitions well.

She also recommended increasing L.Y.'s therapy appointments from every two weeks to weekly if the juvenile court terminated the guardianship and for L.Y. to maintain frequent visitation with the guardians.

L.Y. testified outside the presence of her parents and guardians. L.Y. stated she would like to spend more time with Mom, but she did not want to live with her because she felt she "wouldn't get to see [the guardians'] family that I live with as much" and she was worried about making new friends at a new school. She explained some of the irregular contact with Mom stemmed from her own schedule and plans she had with friends, for example, that interfered with her opportunity to visit Mom on the weekends.

L.Y. expressed her worry about people being mad at each other in the case, stating she was nervous that "the decision [she] make[s] would be like upset one person but then not the other." When asked what could be done to ease the transition to Mom if the guardianship was terminated, L.Y. stated, "Maybe just kind of walk into it like not go straight from not living to living there. Maybe just kind of start doing like a week, a week and a half, two weeks, and then just kind of start adding that up." She also expressed her desire for a set schedule of when she would see her parents if the guardianship continued.

On July 27, the juvenile court filed an order terminating the guardianship. The court began its order by issuing credibility findings toward the witnesses. At

the outset, it took note of Mom's and L.Y.'s credibility and demeanor. Regarding Mom, the court explained,

> Despite her own difficult personal history and some hard feelings toward others involved in the guardianship proceedings, [Mom] stayed above the fray. Her demeanor and manner of delivering her testimony remained consistently direct, composed, thoughtful, compassionate and devoid of any exaggeration or minimization. The court finds [Mom]'s testimony to be credible and reliable . . . . When weighing the evidentiary value of all the testimony that was received by the court on July 23, 2020, the court assigns the most weight to the testimony offered by [Mom] herself.

Regarding L.Y., the court found "her testimony to be credible and reliable as well as relevant and material" but afforded "it less weight given [L.Y.]'s lack of maturity and the extreme conflict she feels in her family relationships." It summarized, "[O]ther credible evidence demonstrated that [L.Y.]'s age, desire to be with friends and most importantly, her desire to avoid upsetting the adults in her life has a deleterious effect on the reliability of her testimony as to the ultimate question concerning termination of the guardianship." The court also took note of the credibility and demeanor of the guardians, concluding their in-court testimony was of "minimal evidentiary value."

In reaching its decision to terminate the guardianship, the court relied on Iowa Code section 232D.503(2), which allows the court to terminate a guardianship established pursuant to section 232D.203 if the court finds the basis for the guardianship is no longer satisfied "unless the court finds that the termination of the guardianship would be harmful to the minor and the minor's interest in continuation of the guardianship outweighs the interest of a parent of the minor in the termination of the guardianship." The court expressed

confusion over the applicable burden and standard of persuasion necessary to terminate the guardianship because they were not specifically set forth in chapter 232D, so it fell "back on a recognized standard in civil proceedings in which the movant prove up the relief sought in the motion by a preponderance of evidence." Applying this burden and standard, the court determined Mom proved by a preponderance of the evidence that the guardianship was no longer necessary, that termination was not harmful to L.Y., and that L.Y.'s interest in continuation of the guardianship did not outweigh Mom's interest in the termination of the guardianship.

The court concluded the basis for the guardianship was not currently satisfied because "the parents have achieved security and stability in their lives," and "[Mom] is a capable and appropriate parent able to immediately assume permanent care and custody of [L.Y.]." Further, it determined "[t]he continuation of the guardianship only creates further instability for [L.Y.]" as L.Y. continues to question the separation from her parents and that questioning required therapeutic intervention to restore her sense of security. The court declared, "[H]ad the guardianship been terminated years earlier as requested by [Mom], [L.Y.] would not have developed the psychological turmoil requiring the therapeutic intervention described here."

Finally, it explained that Mom's interest in parenting L.Y. outweighed L.Y.'s interest in continuing the guardianship, reasoning,

> Parenthood is a fundamental right. When a parent is safe and stable, that right should be vindicated. [Mom] moves to terminate the guardianship and have [L.Y.] returned to her. [L.Y.]'s father asks for continuation of the guardianship. [Mom] is a safe, stable and sincere

mother. She has a safe and stable home for [L.Y.] [L.Y.] should be returned to her mother's care for placement in [Mom]'s home pending modification of the parent's decree of dissolution to legally establish physical and legal custody.

Although the court noted both parents' belief that a petition to modify the divorce decree related to L.Y. would be forthcoming if the guardianship was terminated, it concluded that "any recognition of possible legal action to modify the decree is not a reason not to consider termination of the guardianship nor should avoidance of any such legal action be a reason not to terminate the guardianship."

The guardians appealed, arguing, among other claims, that the juvenile court erred in terminating the guardianship because the recently enacted new guardianship act repealed the statutory preference under section 633.559 of the 2019 Iowa Code favoring a child's parents over all others as guardian for the child. Accordingly, the guardians maintained the juvenile court erred in relying on Mom's status as a parent to conclude "[a]ny interest [L.Y.] may have in continuing the guardianship is outweighed by her mother's interest in parenting her daughter" because "[p]arenthood is a fundamental right" that "should be vindicated" when the "parent is safe and stable." They also claimed the basis for the guardianship is still satisfied because "good cause" exists for one under Iowa Code section 232D.203(1)(*b*)(4). In her appellate brief, Mom challenged the juvenile court's decision to apply the rule in civil proceedings in which the movant—Mom in this case—must prove up the relief sought in the motion by a preponderance of the evidence. Mom contends that "[t]he guardians have the

burden to overcome a parental preference and show that the child's best interests require a continuation of the guardianship."

The court of appeals rejected the guardians' claim that the need for the guardianship still exists, noting Mom's revocation of consent to the guardianship meant the grounds for creating the guardianship under section 232D.203 were no longer met. Nevertheless, it reversed the juvenile court's termination of the guardianship, concluding that termination was harmful to L.Y. and that L.Y.'s interest in continuing the guardianship outweighed Mom's interest as a parent. In doing so, the court of appeals recognized that Mom has "a general fundamental interest in parenting L.Y." but concluded that the new guardianship act's repeal of the statutory preference for parents previously codified in section 633.559 of the 2019 Iowa Code prohibited the court from recognizing a parental preference over all others as a child's guardian in guardianship proceedings. The court of appeals did not address the burden of proof. We granted Mom's application for further review.

**II. Standard of Review.**

An action to terminate a guardianship is equitable in nature, so our review is de novo. *In re Guardianship of Kennedy*, 845 N.W.2d 707, 709 (Iowa 2014). We give weight to the juvenile court's factual findings, but we are not bound by them. *Id.* Further, we review constitutional challenges to statutes de novo. *Santi v. Santi*, 633 N.W.2d 312, 316 (Iowa 2001). In doing so, we presume statutes are constitutional, "imposing on the challenger the heavy burden of rebutting that presumption." *Id.* "[I]f a statute is susceptible to more than one construction, one

of which is constitutional and the other not, we are obliged to adopt the construction which will uphold it." *Id.* Nevertheless, a statute is invalid on its face if "no application of the statute could be constitutional under any set of facts." *Doss v. State*, 961 N.W.2d 701, 716 (Iowa 2021) (quoting *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 764 (Iowa 2019)).

### III. Analysis.

This case requires us to interpret recent changes to our guardianship statutes under the Iowa Minor Guardianship Proceedings Act (Guardianship Act), 2019 Iowa Acts ch. 56, §§ 1–29 (codified at Iowa Code ch. 232D (2020)). The Guardianship Act is based on the work of the Guardianship and Conservatorship Reform Task Force, which our court established in January 2015 to "address the challenges that the Iowa guardianship and conservatorship system faces now and will face in the future in meeting the needs of vulnerable Iowans." Iowa Guardianship and Conservatorship Reform Task Force, *Final Report* iv (2017), https://www.iowacourts.gov/static/media/cms/Final_Task_Force_Report_5A9 92F4D4AF86.pdf [https://perma.cc/7RKD-TMAF]. We charged the Task Force with identifying "the strengths and weaknesses of Iowa's guardianship and conservatorship laws and practices," examining the guardianship laws and practices of other jurisdictions, developing "recommendations for effective and efficient guardianship laws, practices, and procedures," and developing "recommendations to foster continuous improvement to the guardianship and conservatorship system to ensure it is responsive to future generations of Iowans." *Id.* at 3.

Based on the Task Force's recommendations, the legislature's Guardianship Act created chapter 232D and transferred jurisdiction of guardianships for minors to the juvenile court, in part due to "the expertise of juvenile court judges in the type of parental and family problems at issue in minor guardianship cases." *Id.* at 120. The Guardianship Act also addressed the Task Force's concern "that parental consent to a minor guardianship might not be truly voluntary." *Id.* at 41–42. The Task Force recommended "detailed requirements to ensure that the parental consent is truly voluntary." *Id.* In accord with these requirements, the Guardianship Act now requires parents consenting to a minor guardianship to sign an affidavit "verifying that the parent or parents knowingly and voluntarily consent to the guardianship" and include this affidavit with the guardianship petition. Iowa Code § 232D.203(2). Further, on or before the hearing on the petition, the parents and the proposed guardian must now file an agreement with the court stating the guardian's responsibilities, the parents' responsibilities, and "[t]*he expected duration of the guardianship, if known.*" *Id.* § 232D.203(3) (emphasis added). "If the court grants the petition, it shall approve the guardianship agreement between the custodial parent and the proposed guardian and incorporate its terms by reference unless the court finds the agreement was not reached knowingly and voluntarily or is not in the best interests of the child." *Id.* § 232D.203(4).

The Guardianship Act went into effect on January 1, 2020, and applies retroactively, so it applies to this case. 2019 Iowa Acts ch. 56, §§ 44–45. Here, we must decide under the Guardianship Act whether grounds still exist for the

guardianship and, if not, whether the juvenile court erred by terminating the guardianship. Two primary changes to the guardianship statutes are at issue in this case: (1) the Guardianship Act's repeal of Iowa Code section 633.559, which provided in relevant part that

> [e]xcept for a minor child for whom the court's jurisdiction over the child's guardianship was established pursuant to transfer of the child's case in accordance with section 232.104, the parents of a minor child, or either of them, if qualified and suitable, shall be preferred over all others for appointment as guardian,

Iowa Code § 633.559 (2019), *repealed by* 2019 Iowa Acts ch. 56, § 43, and (2) the Guardianship Act's silence on the burden of persuasion and standard of proof necessary under Iowa Code section 232D.503(2) to terminate a guardianship established with parental consent.

**A. Grounds for Terminating the Guardianship.** The guardians argue the juvenile court erred by terminating the guardianship because "good cause" exists to maintain the guardianship under the new statutory provision of Iowa Code section 232D.203 due to Mom's alleged inability to achieve " 'security and stability' in residence or relationships" and her "immaturity and instability," which have "barely improved" since the guardianship was established. This argument fails because the good cause provision found in section 232D.203(1) does not come into play without a parent's consent, as the statute provides:

> 1. The court may appoint a guardian for a minor if the court finds *all of the following*:
> *a.* The parent or parents having legal custody of the minor understand the nature of the guardianship and knowingly and voluntarily consent to the guardianship.
> *b.* The minor is in need of a guardianship because of any one of the following:

(1) The parent having legal custody of the minor has a physical or mental illness that prevents the parent from providing care and supervision of the child.

(2) The parent having legal custody of the minor is incarcerated or imprisoned.

(3) The parent having legal custody of the minor is on active military duty.

(4) The minor is in need of a guardianship for some other reason constituting good cause shown.

*c.* Appointment of a guardian for the minor is in the best interest of the minor.

(Emphasis added.) It is undisputed that Mom revoked her consent to the guardianship by initiating these proceedings. Because the statute requires "all of the following" conditions to be met, including the parents' knowing and voluntary consent to the guardianship, the grounds for creating a guardianship under section 232D.203 no longer exist. *Id.* § 232D.203(1)(*a*)–(*c*). Nevertheless, we still must address the guardians' claim that the juvenile court should have continued the guardianship because doing so was in L.Y.'s best interests.

1. *Who has the burden of proof?* In an action to terminate or modify a guardianship established by consent, Iowa Code section 232D.503(2) requires the court to make a series of "findings" in order to keep the guardianship in effect.

The court shall terminate a guardianship established pursuant to section 232D.203 if the court finds that the basis for the guardianship set forth in section 232D.203 is not currently satisfied *unless the court finds* that the termination of the guardianship would be harmful to the minor and the minor's interest in continuation of the guardianship outweighs the interest of a parent of the minor in the termination of the guardianship.

Iowa Code § 232D.503(2) (emphasis added). Because the default is termination of the guardianship, the party favoring continuation of the guardianship has the

burden of proof once consent is withdrawn. *See* Iowa R. App. P. 6.904(3)(*e*) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established.").

The guardians point out that the Guardianship Act, which overhauled guardianship laws in Iowa, included a repeal of section 633.559 of the 2019 Iowa Code, favoring a child's parents over all others as guardian for the child. Accordingly, they maintain that Mom had the burden of proof to end the guardianship that had been in effect since 2014. Although the legislature removed section 633.559, it did not replace it with language prohibiting a parental preference. Instead, it added a provision that placed the burden on the guardian to continue the guardianship when the basis for the guardianship is no longer satisfied. *See* Iowa Code § 232D.503(2).

In addition to this statutory burden of proof, the constitutional protections afforded parents in the care, custody, and control of their children undergird a common law parental preference. The constitutionally based parental preference predated section 633.559 and, in our view, survives its repeal. "[T]he relationship between parent and child is constitutionally protected." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978). The fundamental liberty interest of parents "in the care, custody, and control of their children[ ]is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Santi*, 633 N.W.2d at 317 ("This court has likewise acknowledged this parental caretaking interest as fundamental."). This liberty interest includes a parent's fundamental right to

make child-rearing decisions based on the "presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68.

In reversing the juvenile court's order terminating the guardianship, the court of appeals rejected Mom's argument that her fundamental liberty interests in parenting L.Y. created a preference in favor of her as the parent over all others in the guardianship proceeding. The court of appeals recognized Mom's "general fundamental interest in parenting L.Y." but concluded there is no longer any parental preference in guardianship proceedings because the Guardianship Act repealed the statute codifying that preference. Mom maintains the court of appeals' interpretation of the Guardianship Act to eliminate the parental preference disregards our caselaw recognizing the parental preference prior to codification and "is in direct conflict with the basic fundamental and constitutionally protected right of a parent to parent their child without unwarranted state intrusion." We agree.

In light of parents' fundamental liberty interests in the care, custody, and control of their children and the presumption that fit parents act in their children's best interests, we must give "due regard for the superior rights of a fit, proper, and suitable parent" over all others. *In re Guardianship of D.J.*, 682 N.W.2d 239, 245 (Neb. 2004) (emphasis omitted) (quoting *Nielsen v. Nielsen*, 296 N.W.2d 483, 488 (Neb. 1980)). "[T]he parental superior right to child custody protects not only the parent's right to the companionship, care, custody, and management of his or her child, but also protects the child's reciprocal right to be raised and nurtured by a biological or adoptive parent." *Id.* at 244 (quoting

*Uhing v. Uhing*, 488 N.W.2d 366, 374–75 (Neb. 1992)); *see also Johnson v. Hunter*, 447 N.W.2d 871, 876 (Minn. 1989) (en banc) ("[E]stablishment of the parent–child relationship is the most fundamental right a child possesses to be equated in importance with personal liberty and the most basic constitutional rights." (alteration in original) (quoting *Ruddock v. Ohls*, 154 Cal. Rptr. 87, 91 (Ct. App. 1979))). As the Colorado Supreme Court explained,

> An important characteristic of a guardianship by parental consent is that parents have exercised their fundamental right to place their child in the custody of another for purposes of furthering the child's best interests. Failure to accord fit parents a presumption in favor of their decision to terminate a guardianship established by parental consent would penalize their initial decision to establish the guardianship and deter parents from invoking the guardianship law as a means to care for the child while they address significant problems that could impair the parent–child relationship or the child's development.

*In re D.I.S.*, 249 P.3d 775, 783 (Colo. 2011) (en banc) (citation omitted).

Our court has similarly stated that parents "should be encouraged to look for help with the children[] from those who love them without the risk of thereby losing the custody of the children permanently." *Painter v. Bannister*, 140 N.W.2d 152, 156 (Iowa 1966). Thus, "[r]ecognition that the non-parental party is an excellent parent to the child will rarely be strong enough to interfere with the natural rights of the parent." *Northland v. Starr*, 581 N.W.2d 210, 212 (Iowa Ct. App. 1998); *see also In re Mann*, 293 N.W.2d 185, 190 (Iowa 1980) ("Courts are not free to take children from parents simply by deciding another home offers more advantages." (quoting *In re Burney*, 259 N.W.2d 322, 324 (Iowa 1977)). "As tempting as it is to resolve this highly emotional issue with one's heart, we do not have the unbridled discretion of a Solomon. Ours is a system of law." *In re*

*B.G.C.*, 496 N.W.2d 239, 241 (Iowa 1992) (en banc). Guided by these principles, it is not unusual for Iowa's courts to "remove children from conscientious, well-intentioned custodians with a history of providing good care to the children and place[] them with a natural parent." *Zvorak v. Beireis*, 519 N.W.2d 87, 88–89 (Iowa 1994) (citing several cases involving these types of guardianship disputes).

Ultimately, the well-established parental preference in guardianship cases precedes the previously codified statutory preference. But more importantly, the parental preference is inseparably intertwined with the fundamental liberty "interest of parents in the care, custody, and control of their children." *Troxel*, 530 U.S. at 65; *see also Santi*, 633 N.W.2d at 317. As numerous other state courts have recognized, "[A] parent does not relinquish his fundamental liberty interest in raising his child by consenting to a guardianship, and, thus, is entitled to the *Troxel* presumption in a proceeding to terminate the guardianship" that creates a preference in favor of the parent over all others. *In re Guardianship of Reena D.*, 35 A.3d 509, 512 (N.H. 2011) ("Most courts that have examined [whether the *Troxel* presumption applies in guardianship termination proceedings] since *Troxel* have held that it does.").[2]

---

[2]*See also Ex parte Terry*, 494 So. 2d 628, 632 (Ala. 1986) ("The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law." (quoting *Ex parte Mathews*, 428 So. 2d 58, 59 (Ala. 1983) (per curiam))); *In re Guardianship of W.L.*, 467 S.W.3d 129, 133 (Ark. 2015) ("[A] guardianship is no longer necessary once a fit parent revokes an earlier-given consent. This is because a fit parent is presumed to be acting in the child's best interest. By petitioning to terminate the guardianship and revoking consent, the fit parent, who has the child's best interest at heart, informs the court that the guardianship is no longer necessary."); *In re D.I.S.*, 249 P.3d at 783 ("Failure to accord fit parents a presumption in favor of their decision to terminate a guardianship established by parental consent would penalize their initial decision to establish the guardianship and deter parents from invoking the guardianship laws as a means to care for the child while they address significant problems that could impair the parent–child relationship

or the child's development."); *Tourison v. Pepper*, 51 A.3d 470, 473 (Del. 2012) ("This Court agrees that the *Troxel* presumption in favor of a fit parent should apply to the termination of guardianships."); *Boddie v. Daniels*, 702 S.E.2d 172, 175 (Ga. 2010) (holding a guardianship will be terminated unless the guardian can prove, in part, clear and convincing evidence that the child will suffer significant harm if custody were awarded to the parent); *Stockwell v. Stockwell*, 775 P.2d 611, 613 (Idaho 1989) ("In custody disputes between a 'non-parent' . . . and a natural parent, Idaho courts apply a presumption that a natural parent should have custody as opposed to other lineal or collateral relatives or interested parties."); *In re Custody of Peterson*, 491 N.E.2d 1150, 1151 (Ill. 1986) ("In child-custody disputes it is an accepted presumption that the right or interest of a natural parent in the care, custody and control of a child is superior to the claim of a third person." (quoting *In re Custody of Townsend*, 427 N.E.2d 1231, 1234 (Ill. 1981), *abrogated on other grounds by In re R.L.S.*, 844 N.E.2d 22 (Ill. 2006))); *In re Guardianship of L.L.*, 745 N.E.2d 222, 230 (Ind. Ct. App. 2001) ("[T]here is a presumption in all cases that the natural parent should have custody of his or her child."); *In re Guardianship of Williams*, 869 P.2d 661, 669–70 (Kan. 1994) ("Not only is the parental preference doctrine one of long standing in Kansas, it is also the rule, in one form or another, in a majority of the jurisdictions in this country."); *Pastore v. Sharp*, 567 A.2d 509, 512 (Md. Ct. Spec. App. 1989) ("[W]here there is a custody contest between a natural parent and a third party, there is a rebuttable presumption in favor of the natural parent."); *Hunter v. Hunter*, 771 N.W.2d 694, 707 (Mich. 2009) ("Since [the Michigan statute] applies a substantial presumption of the validity of decisions by all parents, including fit custodial parents, the constitutional underpinnings of *Troxel* are satisfied."); *Durkin v. Hinich*, 442 N.W.2d 148, 152–53 (Minn. 1989) (en banc) (recognizing the Minnesota Supreme Court's longstanding presumption in custody determinations that natural parents are fit to raise their own children, so the non-parent challenging custody has the burden to disprove that presumption applies); *In re Guardianship of J.R.G.*, 708 P.2d 263, 267 (Mont. 1985) ("[T]he burden was on appellant to prove that the best interest of the child would be served by a continuation of the guardianship. We reach this result because of the presumption in other jurisdictions, and now adopted by this Court, that the best interest of a child is served in custody of natural parents."); *In re Guardianship of D.J.*, 682 N.W.2d at 246 ("[B]ecause a guardianship is temporary and does not terminate parental rights, we conclude that the constitutional concerns which serve as the justification for the parental preference principle in other situations also apply to parent's seeking to regain custody by terminating the guardianship with respect to their children."); *Zack v. Fiebert*, 563 A.2d 58, 63 (N.J. Super. Ct. App. Div. 1989) ("[N]ormally, when a third party seeks custody as against a natural parent, the standard should be the termination standard of unfitness. The application of this standard is footed in the presumption in favor of the natural parent's superior right to custody." (citation omitted)); *Shorty v. Scott*, 535 P.2d 1341, 1344 (N.M. 1975) ("[There is] a presumption that the welfare and best interests of the minor child will best be served in the custody of the natural parents and casts the burden of proving the contrary on the non-parent."); *Phillips v. Choplin*, 309 S.E.2d 716, 720 (N.C. Ct. App. 1983) ("It is a well established principle 'that the natural parent is presumed to be the appropriate custodian of his or her child as opposed to third persons . . . .' " (quoting *In re Kowalzek*, 246 S.E.2d 45, 47 (N.C. Ct. App. 1978)); *Worden v. Worden*, 434 N.W.2d 341, 342 (N.D. 1989) (requiring "exceptional circumstances" before the court may award custody to a third party over a natural parent because "[p]arents have the right to the custody and companionship of their children superior to that of any other person"); *In re Marriage of Hruby*, 748 P.2d 57, 60 (Or. 1987) (en banc) ("In child custody disputes between natural parents and other private parties, this court early resolved the tension between the custodial rights of natural parents and the *parens patriae* power of the state by applying some variant formulation of the rule that a natural parent was entitled to the custody of his or her children unless that parent was unfit or unable to care for the children properly; absent such a threat to the children's welfare, their interests, much less the interests of nonparents seeking their custody, were of no concern."); *Michael T.L. v. Marilyn J.L.*, 525 A.2d 414, 419 (Pa. Super. Ct. 1987) ("It is well-settled that natural parents in custody disputes are favored over third parties."); *Skeadas v. Sklaroff*,

Parents' fundamental right to the care, custody, and control of their children is seemingly meaningless without a preference for parents who have never been adjudicated unfit over all others in guardianship proceedings. We presume that fit parents are acting in their children's best interests in seeking not only to *establish* but also to *terminate* a guardianship, and this presumption casts the burden of proving the contrary on the non-parent. Accordingly, when interpreting Iowa Code section 232D.503, courts must start with the rebuttable presumption that the child's best interests are served in the parent's custody as opposed to all others.

2. *What is the applicable burden of proof in guardianship termination proceedings?* Before the Guardianship Act took effect, guardians had to prove

---

122 A.2d 444, 446 (R.I. 1956) (per curiam) ("Unless it is shown clearly that by abandonment or other conduct or conditions the parents are presently unfit and unable to discharge their parental duties to the child according to law, a court should consider the welfare of the child with due regard for the superior rights of fit and suitable parents."); *Moore v. Moore*, 386 S.E.2d 456, 458 (S.C. 1989) (holding that "there is a rebuttable presumption that it is in the best interest of any child to be in the custody of its biological parent," even in cases of parents who temporarily relinquish custody for the child's best interest); *Hutchison v. Hutchison*, 649 P.2d 38, 40 (Utah 1982) ("In a controversy over custody, the paramount consideration is the best interest of the child, but where one party to the controversy is a nonparent, there is a presumption in favor of the natural parent."); *Boisvert v. Harrington*, 796 A.2d 1102, 1108 (Vt. 2002) ("[A] parent who seeks to revoke a guardianship under [the Vermont statute] enjoys a presumption that his or her custody is in the child's best interest."); *Bailes v. Sours*, 340 S.E.2d 824, 827 (Va. 1986) ("[I]n a custody dispute between a parent and a non-parent, 'the law presumes that the child's best interests will be served when in the custody of its parent.'" (quoting *Judd v. Van Horn*, 81 S.E.2d 432, 436 (Va. 1954))); *Ford v. Ford*, 303 S.E.2d 253, 255 (W. Va. 1983) (per curiam) ("The law in this State is that 'the fit natural parent's right to custody of his or her child is paramount to that of any third party, including a grandparent.'" (quoting *Leach v. Bright*, 270 S.E.2d 793, 794 (W. Va. 1980) (per curiam))). *But see In re Guardianship of L.V.*, 38 Cal. Rptr. 3d 894, 904 (Ct App. 2006) (holding parents who have relinquished their day-to-day parental relationship are not entitled to the *Troxel* presumption); *Grant v. Martin*, 757 So. 2d 264, 266 (Miss. 2000) (en banc) ("[A] natural parent who voluntarily relinquishes custody of a minor child, through a court of competent jurisdiction, has forfeited the right to rely on the existing natural parent presumption. A natural parent may reclaim custody of the child only upon showing by clear and convincing evidence that the change in custody is in the best interest of the child."); *In re Guardianship of ARB*, 495 P.3d 297, 300 (Wyo. 2021) (noting there may be exceptional circumstances that warrant creating an exception to the principle that a fit parent is entitled to custody).

their case by clear and convincing evidence "in view of the rebuttable presumption favoring natural parents" in guardianship termination proceedings. *In re Guardianship of Stewart*, 369 N.W.2d 820, 823 (Iowa 1985). Iowa Code section 232D.503(2), a new statute under the Guardianship Act, is silent as to the burden of proof in proceedings to terminate guardianships established with parental consent. The juvenile court required Mom, as the movant, to prove the guardianship should be terminated by a preponderance of the evidence. Based on the Guardianship Act's repeal of the statutory presumption favoring parental custody, the guardians ask the court to draw from child custody principles that require the movant to establish the guardianship should continue under a preponderance of the evidence standard.

In *Santi v. Santi*, we held that Iowa's grandparent visitation statute at the time violated the Iowa Constitution because it failed "to accord fit parents the presumption deemed so fundamental in *Troxel*" and "effectively substitute[d] sentimentality for constitutionality." 633 N.W.2d at 320. In doing so, we applied the most demanding constitutional standard—strict scrutiny—to analyze the statute due to the fundamental liberty interests at stake because it infringed on the parent–child relationship. *Id.* at 318. We, too, must apply the most demanding standard applied to civil cases—clear and convincing evidence—when we consider whether a guardianship should be maintained against a parent's wishes. "Evidence is 'clear and convincing' when there are no 'serious or substantial doubts as to the correctness or conclusions of law drawn from the

evidence.' " *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (quoting *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) (en banc)).

This heightened standard aligns with the standard of proof required to *continue* the guardianships of minor children established without parental consent and voluntary guardianships of adults. *See* Iowa Code § 232D.503(3); *see also* Iowa Code § 633.635(5) ("Any modification [of the guardianship] that would be more restrictive or burdensome for the protected person shall be based on clear and convincing evidence . . . ."). For example, the Guardianship Act specifically states:

> A person seeking termination of guardianship established pursuant to section 232D.204 [(a guardianship of a minor child without parental consent)] has the burden of making a prima facie showing that the guardianship should be terminated. If such a showing is made, the guardian has the burden of going forward to prove by clear and convincing evidence that the guardianship should not be terminated.

Iowa Code § 232D.503(3).[3]

---

[3]Amicus curiae the Iowa Guardianship and Conservatorship Association (the Association) argues that this statutory provision governs the present case. According to the Association, once Mom in this case revoked her consent to the guardianship that was established under Iowa Code section 232D.203, the guardianship was then governed by Iowa Code section 232D.204 because it became a guardianship without parental consent. The Association argues the standard of proof applied to the termination of those guardianships then applies to cases like this one, so termination of the guardianship is necessary unless there is clear and convincing evidence that "(1) termination 'would be harmful to the minor and the minor's interest in continuation of the guardianship outweighs the interest of a parent of the minor in the termination of the guardianship' under section 232D.503(2); AND (2) the limited grounds for establishing an involuntary guardianship exist under section 232D.204."

This argument contradicts the plain language of the Guardianship Act. *See Brewer-Strong v. HNI Corp.*, 913 N.W.2d 235, 249 (Iowa 2018) (" '[O]ur goal [in interpreting statutory provisions] is to determine and effectuate the legislature's intent.' We make this determination by looking at the legislature's language rather than speculating about what the legislature might have said." (quoting *Ramirez-Trujillo v. Quality Egg, L.L.C.*, 878 N.W.2d 759, 770 (Iowa 2016)). A guardianship established with parental consent under Iowa Code section 232D.203 cannot automatically convert to a guardianship established under Iowa Code section 232D.204 because those are different statutes with different requirements for establishing guardianships that we cannot

Requiring clear and convincing evidence here also aligns with the standard of proof required to *establish* guardianships for minor children without parental consent. *See* Iowa Code § 232D.204. It doesn't make sense that we would require clear and convincing evidence to show a guardianship should be established or continued for guardianships of minor children without parental consent, yet we would require a lesser standard of proof to show a guardianship should be continued when the guardianship was established with the parent's consent and the parent has subsequently revoked that consent. In any of those situations, the parent is not consenting to the guardianship. Like parents who have had their minor children placed into guardianships without parental consent, parents who have entered into consensual guardianships and later revoked that consent are facing a serious deprivation of their fundamental liberty interests in raising their children. Because of the liberty interests at stake, the clear and convincing evidence standard is the appropriate one to apply in proceedings to terminate guardianships of minor children established with parental consent. We further note that most courts that have considered the issue place the burden of proof on the guardian opposing termination of the voluntary guardianship with clear and convincing evidence as the standard of proof. *See, e.g.*, *Boddie v. Daniels*, 702 S.E.2d 172, 175 (Ga. 2010); *In re Guardianship of Reena D.*, 35 A.3d at 514.

---

ignore. "We are not at liberty to rewrite the statute." *Marek v. Johnson*, 958 N.W.2d 172, 177 (Iowa 2021).

Overall, when a parent who has never been adjudicated unfit files a motion to terminate a guardianship established with parental consent under Iowa Code section 232D.203, the juvenile court must start with the rebuttable presumption that the child's best interests are served by reuniting the minor child with their parent. The guardian bears the burden of rebutting this presumption by clear and convincing evidence that the guardianship should continue because "termination of the guardianship would be harmful to the minor and the minor's interest in continuation of the guardianship outweighs the interest of a parent of the minor in the termination of the guardianship." Iowa Code § 232D.503(2).

3. *What must the guardians prove by clear and convincing evidence?* The guardians ask the court to draw from child custody principles under Iowa Code chapter 598. However, guardianship cases require a different legal analysis from child custody cases involving two fit parents in which the child's best interests are the paramount consideration. "In such cases, a consideration of parental rights is unnecessary because both parties are on equal footing in the eyes of the law." *Shorty v. Scott*, 535 P.2d 1341, 1344 (N.M. 1975). In guardianship disputes between a parent and a third party, "the best interests of the child is the primary inquiry, [but] this does not 'automatically overcome the constitutional interest of the parents.'" *In re D.I.S.*, 249 P.3d at 782 (quoting *In re M.G.*, 58 P.3d 1145, 1147 (Colo. App. 2002)). In summary, "While the best interests of the child remain the lodestar of child custody disputes, a parent's superior right to custody must be given its due regard, and absent its negation, a parent retains

the right to custody over his or her child." *In re Guardianship of D.J.*, 682 N.W.2d at 245.

Under the Guardianship Act, the guardian must prove by clear and convincing evidence that (1) termination of the guardianship would be harmful to the minor; and (2) the minor's interest in continuation of the guardianship outweighs the interest of a parent of the minor in the termination of the guardianship. Iowa Code § 232D.503(2). To meet this standard, it is insufficient for the guardians to show that they would provide superior care to the child. We have said that "[e]conomic and cultural advantages in the [guardians'] home do not tip the balance in their favor." *In re Burney*, 259 N.W.2d at 324. Further, because "guardianships are designed to temporarily relieve parents of the rigors of raising a child," it is "particularly inappropriate" to focus solely "on a parent's failure to discharge the duties of parental care and protection." *In re Guardianship of Robert D.*, 696 N.W.2d 461, 470 (Neb. 2005); *cf. In re Guardianship of Ashleigh R.*, 55 P.3d 984, 992 (N.M. Ct. App. 2002) ("Evidence that a parent left a child in the care of others is not necessarily sufficient to establish neglect, as long as the parent continues to insure that the caretaker is properly providing for the children's needs."). "A contrary rule would have the unfortunate effect of discouraging parents from seeking assistance when they find themselves unable to fully discharge the responsibilities of parenthood." *In re Guardianship of Ashleigh R.*, 55 P.3d at 992.

Instead, we apply what the Georgia Supreme Court explained is a "rigorous harm standard." *Boddie*, 702 S.E.2d at 175. This requires the third party to show

"either physical harm or significant, long-term emotional harm," not "merely social or economic disadvantages" "to ensure that the temporary guardianship will be continued only when a real threat of harm would result from termination." *Id.* (first and second quoting *Wade v. Clark*, 544 S.E.2d 99, 107 (Ga. 2001)). Otherwise, we risk "the possibility that the desires of fit and suitable parents may lose out to guardians who are able to provide the child a nicer home, a better school district, or more extracurricular activities." *In re D.I.S.*, 249 P.3d at 787.

A child's anxiety over the transition from one home to another does not rise to the level of significant emotional harm that would rebut the parental presumption in favor of reuniting the child with the parent. *See, e.g., In re Burney*, 259 N.W.2d at 324 ("The most serious obstacle to [terminating the guardianship] is the psychological trauma the transfer of custody may cause [the child]. However, so far as the record discloses, [the child] is emotionally healthy, knows [the parents] well, and has not been in the [guardians'] custody so long that an extraordinary threat to his well-being is posed by the prospective transfer."); *Hulbert v. Hines*, 178 N.W.2d 354, 362 (Iowa 1970) ("No doubt [the child] will experience some upset by being returned to her parents but we conclude her best interest now and in the future will be served thereby."). No matter how cases like this one are resolved, there will likely be anxiety and stress for the child for a period of time.

> Evidence sufficient to rebut the presumption may, but need not necessarily, consist of the parent's present unfitness, or past abandonment of the child such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child.

However, a general finding that it would be in the child's "best interest" to be placed in the third party's custody is not sufficient to rebut the presumption.

*In re Guardianship of L.L.*, 745 N.E.2d 222, 230–31 (Ind. Ct. App. 2001). This is consistent with the due process clauses of the United States Constitution and the Iowa Constitution, which "do[] not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made." *Santi*, 633 N.W.2d at 321 (quoting *Troxel*, 530 U.S. at 72–73).

**B. Termination of the Guardianship in This Case.** We find the juvenile court erred in placing the burden of proof on Mom instead of the guardians. We also find the juvenile court erred in applying a preponderance of the evidence standard instead of a clear and convincing standard. But the juvenile court's conclusion to terminate the guardianship was correct. This case has been working its way through our appellate court system for more than a year and the court of appeals reached the opposite outcome in ruling the juvenile court should not have terminated the guardianship. Needless to say, for a minor who already struggles with confusion over her guardianship situation, L.Y.'s sense of stability has been in limbo for too long. *Cf. In re C.M.*, 652 N.W.2d 204, 211 (Iowa 2002) ("We think the State's interest in obtaining a permanent home for a child as soon as possible is a compelling governmental interest.").

Because we are vested with de novo review authority and the record before us is complete, remand is not necessary in this case. *Cf. State v. Brooks*, 760 N.W.2d 197, 203–04 (Iowa 2009) (concluding remand was unnecessary in

an appeal challenging the validity of a search because "we g[a]ve the parties what they ask[ed] for, namely, a de novo review of the validity of the search based upon the entire record developed in the district court"). Where the juvenile court already rejected the guardians' claims that Mom is unfit and that termination would be harmful to L.Y. despite improperly placing the burden on Mom, it would necessarily make the same finding under the more stringent standard we adopt today when imposed on the guardians. Therefore, we vacate the court of appeals decision and affirm the judgment of the juvenile court but do so by applying the analysis described above that comports with Mom's fundamental liberty interests. *Cf. In re C.M.*, 652 N.W.2d at 211 ("[D]elays in the resolution of termination cases [are] 'decidedly antagonistic to the children's best interest." (quoting *In re A.C.,* 415 N.W.2d 609, 615 (Iowa 1987))).

Notably, the juvenile court did apply the requisite parental preference and rebuttable presumption in concluding,

> Any interest [L.Y.] may have in continuing the guardianship is outweighed by her mother's interest in parenting her daughter. Parenthood is a fundamental right. When a parent is safe and stable, that right should be vindicated. . . . [Mom] is a safe, stable and sincere mother. She has a safe and stable home for [L.Y.] [L.Y.] should be returned to her mother's care for placement in [Mom]'s home pending modification of the parent's decree of dissolution to legally establish physical and legal custody.

Aside from incorrectly requiring Mom to prove the guardianship is no longer necessary by a preponderance of the evidence, the juvenile court's ruling is well reasoned and thorough. On our de novo review, we agree with the juvenile court's findings.

Because there is little we can add to the juvenile court's reasoning for terminating the guardianship, we adopt the following reasoning from the juvenile court as our own:

> The continuation of the guardianship only creates further instability for [L.Y.]
>
> . . . .
>
> [L.Y.] would like a set schedule for visitation with her parents. Such a schedule would result either in the diminution of time with her parents who live separately and require separate weekends for visitation in order to make time for [L.Y.]'s social engagements. This is contrary to both the interests of [L.Y.] and her parents. She is closely bonded to her mother and expresses obvious joy and affection when visiting with [Mom]. Terminating the guardianship would result in the permanent physical custody of [L.Y.] with her mother and visitation to her father. This would permit [L.Y.] an opportunity to have every other weekend set aside for social engagements. Such engagements are important to a child entering middle school and developing prosocial adolescent peer relationships. The [guardians] would be free to visit [L.Y.] at other times and during times when she is exercising visitation with her father. This would create the stability desired by [L.Y.] in maintaining relationships with important adults in her life.
>
> . . . .
>
> Termination of the guardianship will not deprive [L.Y.] of the benefits of a deep and healthy relationship with her extended family. Placement of [L.Y.] with her mother will in fact continue to foster those important extended familial relationships. . . .
>
> . . . .
>
> The foregoing leads the court to conclude that termination of the guardianship would not be harmful to [L.Y.] What is harmful to [L.Y.] is the continued trauma she experiences by being caught in the middle of three homes. She deserves a single home with a stable parent in which her needs are met. It would be a home base for her physically and emotionally. That home is with her mother.
>
> Although the court recognizes that change is often difficult, [L.Y.] has tremendous family support and has the support of her individual therapist. She has been in therapy under the

guardianship and the guardians have not fully complied with therapeutic recommendations. Continuation of the guardianship is only likely to continue [L.Y.]'s confusion and anxiety. She deserves to have a relationship with a primary physical custodian who is a parent and one who will continue to foster the important extended family relationships with the noncustodial parent and his extended family . . . that person is [L.Y.'s mom].

Noticeably absent from the record are any red flags or concerns about Mom's parenting abilities. Throughout the guardianship, Mom continued to maintain contact with L.Y. and ensure that the guardians were properly providing for L.Y.'s needs. *See In re Guardianship of Ashleigh R.,* 55 P.3d at 992 ("Evidence that a parent left a child in the care of others is not necessarily sufficient to establish neglect, as long as the parent continues to insure that the caretaker is properly providing for the children's needs."). Thus, the guardianship was successful because it allowed Mom to seek help in caring for L.Y. when she needed it from loving grandparents who were temporarily able to provide that care until Mom was once again able to parent L.Y. full time. Because of that success, the juvenile court correctly terminated the guardianship and placed L.Y. in Mom's care pending modification of the parent's dissolution decree to legally establish physical and legal custody.

**C. Appellate Attorney Fees.** Mom requests appellate attorney fees. "The general rule—subject to an exception for circumstances in which a losing party has acted in bad faith, wantonly, or for oppressive reasons—is that a party has no claim for attorney fees in the absence of a statute or contract allowing such an award." *In re Guardianship of M.D.,* 797 N.W.2d 121 (Iowa Ct. App. 2011).

Because there is no evidence that the guardians acted oppressively or in bad faith, we decline Mom's request.

## IV. Conclusion.

For these reasons, we vacate the decision of the court of appeals and affirm the juvenile court's order terminating the guardianship.

**DECISION OF COURT OF APPEALS VACATED; JUVENILE COURT JUDGMENT AFFIRMED.**