2011 VT 30

## In re K.M.M.

[22 A.3d 423]

No. 10-145

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 4, 2011

374

*Deborah T. Bucknam* and *Jennifer B. Black* of *Deborah T. Bucknam & Associates*, St. Johnsbury, for Plaintiff-Appellee/Cross-Appellant.

*William P. Neylon* and *Jared H. Cloutier* (On the Brief) of *Law Office of William P. Neylon*, St. Johnsbury, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Johnson, J.** The appeal before us involves the custody of K.M.M., a child who has been a ward of her grandfather since her parents entered into a voluntary guardianship in 2001 when she was eleven months old. Despite father's petitions to terminate the guardianship, first filed in 2002, and grandfather's petitions to terminate parental rights and for adoption, there has been no resolution of this family drama for nine years. In 2009, the matter was eventually heard by the Caledonia Superior Court, on appeal from the Caledonia Probate Court. The superior court denied grandfather's petition to terminate father's parental rights but also denied father's motion to terminate the guardianship, essentially maintaining the status quo. Both parties appealed. We affirm the superior court's denial of the petition to terminate parental rights but reverse its order denying father's motion to terminate the guardianship. We remand to the family division of the superior court to implement the transfer of K.M.M.'s custody to her father.

¶ 2. The superior court's findings reveal the following history. K.M.M. is now an eleven-year-old girl whose grandfather has been her legal guardian since November 20, 2001. Father and mother voluntarily consented to the guardianship at that time because both parents had problems with substance abuse and because father was incarcerated for various criminal violations, including a conviction involving a high speed chase with police while K.M.M. was in the car.

.

¶ 3. Father was released from confinement in June 2002 and began to take control of his life. Although father sought termination of the guardianship as early as 2002, the Caledonia Probate Court did not act on his petition until it issued a pro forma order denying it in 2009. During the years 2002 to 2009, and despite motions and petitions from father and grandfather, the probate court, at most, attempted to work out a visitation schedule. It ordered several family studies and evaluations, but the recommendations of those studies were largely ignored because the relationship between father and grandfather prevented any cooperation between the parties. As the superior court found, it is fair to say that neither father nor grandfather has acted in K.M.M.'s best interest, and the conflict has had a negative effect on K.M.M.

¶ 4. For example, a 2006 court-ordered report from Casey Family Services assessing K.M.M.'s situation described grandfather and father's relationship as "fraught with accusations, stories of anger, hostility, physical harm, and drug/alcohol use and abuse . . . going back as far . . . as [father's] childhood recollections." Furthermore, it explained that "[t]he level of mistrust in this extended family is significant" and includes anger, resentment, hostility, and lack of trust between father and grandfather. This 2006 report included a number of recommendations for father and grandfather regarding K.M.M., including that the guardianship remain intact for four more months and that, during that time, father receive intensive family-based services in the home, grandfather inform father of and invite him to medical and school meetings, and father participate in those meetings. Most of these recommendations were ignored "[b]ecause of the continuing animosity between father and son." The superior court found that "it was clear that [grandfather] would not agree to take part in a program that might lead to the return of K.M.M. to [father's] custody." Recommendations from a second referral to Northeast Kingdom Human Services in 2007 were similarly hindered by the conflict between father and grandfather. They refused to participate in recommended joint therapy, and grandfather would not agree to the recommended increased visitation by father.

¶ 5. Although father and grandfather have an acrimonious relationship that has resulted in a tug-of-war over K.M.M., each has a good relationship with the child. The superior court found that there was nothing in the Casey Family Services report that "[came] close to supporting" grandfather's petition to terminate

father's parental rights. Rather, the reports of a case manager from Northeast Kingdom Human Services who worked with the family in 2007 indicated that the relationship between father and K.M.M. was "appropriate and loving." It is apparent that father has successfully left his past behind. He has not been charged with a criminal offense since his incarceration, and he has stopped abusing alcohol and drugs. He is a high school graduate and has worked as a commercial truck driver. He was gainfully employed from 2006 to 2008, earning reasonable salaries. He was laid off in December 2008 due to the economic downturn and has worked odd jobs and collected unemployment. He has earned income as a logger and landscaper. He owns the mobile home in which he lives with his current partner and their son, who was born in 2007.

¶ 6. At the same time, the superior court found that K.M.M. is well-adjusted to grandfather's home and well cared for by grandfather and his partner. K.M.M. considers grandfather and his partner parent figures, trusting them and looking to them for guidance. She does well in her elementary school and attends church regularly with her grandfather and his partner. Grandfather attends to K.M.M.'s medical needs, including a chronic upper respiratory problem. K.M.M.'s medical expenses are paid for through the Vermont Dinosaur Program. Since his appointment as K.M.M.'s guardian, grandfather has received monthly financial assistance for her care through Reach Up, a program run by the Department for Children and Families. This financial assistance has totaled roughly five thousand dollars annually. While father conceded that he has not paid grandfather for K.M.M.'s care and support, the superior court agreed with father that grandfather would not have accepted money if he had offered to pay.

¶ 7. It is important to note that the various family evaluations and attempts to facilitate visitation between father and daughter were occurring in the context of ongoing attempts by grandfather to adopt K.M.M. and to terminate father's parental rights. In 2005, grandfather petitioned to adopt K.M.M. Father did not consent to the adoption, and grandfather filed a petition to terminate father's parental rights. After a hearing, the probate court denied that petition in October 2006. Thus, although father retained his parental rights, grandfather remained K.M.M.'s guardian. In November 2006, grandfather appealed to the superior court from the probate court order denying the termination of father's parental rights.

¶ 8. The matter could not be brought to conclusion because grandfather had not filed a petition in probate court to terminate mother's parental rights. He mistakenly believed that mother had executed a valid and irrevocable consent to his guardianship. After the probate court denied grandfather's petition to terminate father's parental rights, mother submitted a motion to revoke her consent. The probate court found that mother's initial consent was invalid because it violated 15A V.S.A. § 2-405(a). Grandfather did not appeal this conclusion. Rather, he found himself in superior court appealing the probate court's denial of his petition to terminate only father's parental rights. To avoid a return to probate court for a full hearing on a petition to terminate mother's parental rights, grandfather attempted a procedural workaround: he filed a petition to terminate mother's parental rights, a motion to expedite that petition, and a proposed order denying his petition to terminate mother's parental rights. The probate court allowed this maneuver and issued an order denying grandfather's petition. Grandfather appealed and attempted to consolidate his appeals in superior court. The superior court refused consolidation and dismissed the appeal regarding mother for lack of an underlying record.[*]

¶ 9. Finally, in July 2009, the probate court issued a pro forma denial (without findings) of father's motion to terminate grandfather's guardianship of K.M.M. By that time, father and grandfather had agreed to consolidate the guardianship termination issue with the already-pending appeal concerning father's parental rights, and the probate court's order simply facilitated the consolidation and the de novo hearing in superior court.

¶ 10. After it received the appeal from the probate court, the superior court found father was "ready and able to exercise visitation with his daughter in a responsible way." It ordered visitation on November 12, 2009, specifying certain weekends and holidays when K.M.M. would be with father. On December 27, 2009, grandfather invited father to a family gathering at his house, which father attended. On January 6, 2010, the parties reported

---

[*] In May 2009, the probate court subsequently granted grandfather's petition to terminate mother's parental rights, finding that "subject to the eventual resolution of the remaining custody conflicts among the adults who are important to her," K.M.M. was well-adjusted in her current situation and that mother was unlikely to assume a parental role within any reasonable period of time. Mother did not appeal.

that K.M.M.'s visits with father took place without incident. The court ordered additional visitation, and K.M.M. started spending all weekends with father, as well as April school vacation week.

¶ 11. In its final decision on the petitions before it, the superior court affirmed both the probate court's denial of grandfather's motion to terminate father's parental rights and its denial of father's motion to terminate grandfather's guardianship, finding that the standard for termination set forth in 15A V.S.A. § 3-504(a) had not been met. In particular, it concluded that father was not legally obligated to contribute to the support of K.M.M. and that grandfather would not have accepted any support from father had he offered to pay; that the "evidence clearly demonstrates that [father] would have visited and communicated with his daughter on a regular basis if [he] had been given an opportunity to do so" because he had "matured and turned his life around"; that, as found by the 2006 Casey Family Services evaluation, father "manifested an ability and willingness to assume legal and physical custody of K.M.M.," but these recommendations were not put in place; and that, based on the recent successful visitation and the observations in the Casey Family Services report, "there is a likelihood that [father] may be able to resume parental responsibilities within a reasonable time."

¶ 12. Based on its reading of the standard set forth in *Boisvert v. Harrington*, 173 Vt. 285, 796 A.2d 1102 (2002), however, the court also denied the motion to terminate guardianship. The court noted there is a presumption that the best interests of the minor — the proper inquiry in this proceeding — lie with parental custody and the burden is on the party opposing revocation to overcome this presumption. Nonetheless, the court required father to demonstrate "by his acts and deeds" that K.M.M.'s best interest would be served by returning to his custody. It further concluded in support of its denial that K.M.M. is well-adjusted in grandfather's home; that father has not yet established that it would be in K.M.M.'s best interests to terminate grandfather's guardianship; and that because the Casey Family Services evaluation was prepared in 2006, a new forensic evaluation should take place before any further consideration be given to terminating grandfather's guardianship. The superior court effectively maintained the status quo. It ordered that the January 6 order of visitation "shall remain in full force and effect until such time as it is modified by the Caledonia Probate Court" and remanded the

case to the probate court for further proceedings consistent with the decision. These appeals followed.

¶ 13. On appeal, father argues the court committed reversible error by placing the burden on him to prove that K.M.M.'s best interests lie with parental custody, thereby violating his constitutional due process rights as a parent to the care, custody, and control of his child. Grandfather argues that the court improperly disregarded the required statutory factors when it denied his petition to terminate father's parental rights and improperly placed father's rights ahead of K.M.M.'s best interests.

¶ 14. Our standard for both appeals is the same. The trial court's findings of fact will be affirmed unless they are clearly erroneous. See *In re K.F.*, 2004 VT 40, ¶ 8, 176 Vt. 636, 852 A.2d 584 (mem.). We will uphold its findings if they are supported by credible evidence, even if contrary evidence exists. See *In re T.R.*, 163 Vt. 596, 596-97, 653 A.2d 777, 779 (1994) (mem.). The court's conclusions will stand if supported by the factual findings; conclusions not supported by the findings, however, cannot be sustained. See *In re K.F.*, 2004 VT 40, ¶ 8. We note that questions of law — such as the legal standard to apply — receive de novo review. See *Siegel v. Misch*, 2007 VT 116, ¶ 5, 182 Vt. 623, 939 A.2d 1023 (mem.).

¶ 15. We agree with the parties that the superior court's conclusions, which leave the question of K.M.M.'s permanent custody unresolved and return it to the probate court, are untenable. It was inconsistent and contrary to K.M.M.'s best interests for the court to deny both petitions. Once the court made findings supporting the denial of the termination of parental rights petition, there was no reason not to return K.M.M. to her fit parent; further evaluation or waiting was unnecessary.

¶ 16. We turn first to grandfather's petition to adopt K.M.M. and terminate father's parental rights because that discussion reflects, at the same time, why the voluntary guardianship should be terminated in this case. Title 15A V.S.A. § 3-504 provides the statutory grounds for termination of parental rights in the context of an adoption. If a minor is over the age of six months, the court is required to find, upon clear and convincing evidence, that the parent did not exercise parental responsibility for a period of at least six months immediately preceding the filing of the petition, considering all relevant factors, such as whether the parent failed to:

(A) make reasonable and consistent payments, in accordance with his or her financial means, for the support of the minor, although legally obligated to do so;

(B) regularly communicate or visit with the minor; or

(C) during any time the minor was not in the physical custody of the other parent, to manifest an ability and willingness to assume legal and physical custody of the minor.

15A V.S.A. § 3-504(a)(2); see also *In re J.C.*, 169 Vt. 139, 141, 730 A.2d 588, 589 (1999) (quoting 15A V.S.A. § 3-504(a)(2)). Even if these statutory criteria are met, the court must consider the best interests of the child in accordance with four criteria:

(1) the likelihood that the respondent will be able to assume or resume his or her parental duties within a reasonable period of time;

(2) the child's adjustment to his or her home, school, and community;

(3) the interaction and interrelationship of the child with his or her parents, siblings, and any other person who may significantly affect the child's best interests; and

(4) whether the parent . . . has played and continues to play a constructive role, including personal contact and demonstrated love and affection, in the child's welfare.

15A V.S.A. § 3-504(c); see also *In re J.C.*, 169 Vt. at 141, 730 A.2d at 589-90 (citing 15A V.S.A. § 3-504(c)). In the context of State-initiated proceedings to terminate parental rights, we have noted that the likelihood that the parent will be able to resume or assume parental duties within a reasonable time is the most important of these four factors. *In re B.M.*, 165 Vt. 194, 199, 679 A.2d 891, 895 (1996); see also *In re J.C.*, 169 Vt. at 144, 730 A.2d at 591 (explaining that best interests factors of 15A V.S.A. § 3-504(c) are identical to those applicable to termination proceedings brought by State under 33 V.S.A. § 5540). Title 15A V.S.A. § 3-504(b) additionally provides that if the respondent parent proves by a preponderance of the evidence "good cause" for not exercising parental responsibility, the court may not terminate the respondent's parental rights except upon a finding by clear and

convincing evidence that termination is in the best interest of the minor and that certain additional grounds exist. See also *In re J.C.*, 169 Vt. at 141, 730 A.2d at 589 (describing 15A V.S.A. § 3-504(b)).

¶ 17. Grandfather argues that a parent's failure to comply with any one of the factors in 15A V.S.A. § 3-504 is "sufficient" to terminate parental rights. His contention relies on father's admitted failure to provide financial support for K.M.M. over the length of the guardianship. The superior court found that "while [father] has never contributed to the support of K.M.M., he has never been legally obligated to do so." Because nothing in the appointment of a guardian abrogates a natural parent's duty of support, *In re J.C.*, 169 Vt. at 143, 730 A.2d at 591, grandfather argues that the superior court erred in not terminating father's parental rights.

¶ 18. Grandfather focuses too narrowly on one statutory criterion and misreads the statute as a whole. It is true that a natural parent's obligation to support is not eliminated during a voluntary guardianship. But nonsupport is only one factor among others that might be relevant as the court determines whether the respondent parent "exercise[d] parental responsibility." 15A V.S.A. § 3-504(a)(2). Only if the court finds, upon clear and convincing evidence, that, having considered all the relevant factors, the respondent parent failed to "exercise parental responsibility" and that, upon consideration of the specified criteria, termination is in the best interest of the child shall the court order the termination of a parental relationship. *Id.* § 3-504.

¶ 19. We agree with the superior court that father's failure to make support payments to grandfather was not, alone, a failure to "exercise parental responsibility" within the meaning of the statute. Grandfather asserts that he requested payment at various times from father. The court found, however, that grandfather would not have accepted payments had father attempted to make them. The court also found that no formal order for child support was ever put in place that father ignored and that K.M.M. was financially supported in the guardianship by the state through the Department for Children and Families. Father's obligation remains outstanding, but it does not, in the circumstances of this case, indicate an unwillingness to take responsibility for K.M.M.

¶ 20. Grandfather also contends that father failed to "regularly communicate or visit with the minor" and failed to "manifest an ability and willingness to assume legal and physical custody of the minor." 15A V.S.A. § 3-504(a)(2)(B), (C). Again, grandfather tries to characterize the history of this case in terms of abandonment of responsibility when the record shows that father has been attempting to regain custody since 2002. Grandfather conveniently overlooks his own role in keeping K.M.M. from her father. The court's findings support the view that father would have regularly communicated or visited with K.M.M. had he been given the opportunity to do so. See 15A V.S.A. § 3-504(a)(2)(B). The court acknowledged that father's "communications and visits with K.M.M. have been chaotic" but concluded that "the longstanding anger, resentment, hostility and lack of trust between [father and grandfather]" had "severely limited [father's] ability to communicate and visit with his daughter." Thus, father's limited involvement over the years was, in large part, due to grandfather's refusal to allow increased contact between father and daughter.

¶ 21. Lastly, the court's conclusion that father "manifested an ability and willingness to assume legal and physical custody" was clearly supported by its findings. See 15A V.S.A. § 3-504 (a)(2)(C). The court specifically cites its findings regarding the Casey Family Services report. We note that the court's findings about father's positive behavior and interactions with K.M.M., along with father's continued support of his termination of guardianship petition — first filed just months after the guardianship was established — also support the court's conclusion concerning this factor.

¶ 22. Regarding K.M.M.'s best interests, the court concluded that "there is a likelihood that [father] may be able to resume parental responsibilities within a reasonable time," citing the successful implementation of the November 2009 visitation order and the Casey Family Services report. See 15A V.S.A. § 3-504 (c)(1). As described above, we have emphasized that this is the most important factor in a court's review of a child's best interests. *In re B.M.*, 165 Vt. at 199, 679 A.2d at 895. Thus, the court's emphasis on this factor did not improperly place father's rights ahead of K.M.M.'s best interests, as grandfather argues. Additionally, the court's findings demonstrated that K.M.M. interacts well with father and that he plays a constructive role in her

welfare now that his tumultuous relationship with grandfather no longer prevents him from doing so. These findings, in conjunction with the court's findings regarding father's willingness and ability to become K.M.M.'s custodial parent, support the court's conclusion that there is a likelihood that father will be able to resume parental duties within a reasonable period of time. In short, nothing in the record supports grandfather's petition that father's parental rights should be terminated.

■ ¶ 23. The superior court erred, however, in denying father's petition to terminate the voluntary guardianship. There is no statutory procedure to terminate a voluntary guardianship. In *Boisvert*, we held that a voluntary guardianship established by the probate court is not revocable at a parent's will; rather, the trial court must be free to order an evidentiary hearing to determine whether granting the petition is in the best interests of the child. 173 Vt. at 292, 796 A.2d at 1108. In *Boisvert*, we acknowledged that the "right to care for one's children is a fundamental liberty interest, recognized and protected by this and the United States Supreme Court," and affirmed the parental preference doctrine: "a parent who seeks to revoke a [voluntary] guardianship . . . enjoys a presumption that his or her custody is in the child's best interest." *Id.* Nonetheless, we emphasized that "the proper inquiry in a termination of guardianship proceeding is the best interests of the minor." *Id.* at 291, 796 A.2d at 1107. Ultimately, we upheld the trial court's authority to order an evidentiary hearing to determine whether the transfer of custody is in the best interests of the child. *Id.* at 292, 796 A.2d at 1108. We held that, in these proceedings, the burden of overcoming the presumption that the minor's best interests lie with parental custody belongs to the party opposing revocation. *Id.* at 291, 796 A.2d at 1107.

■ ¶ 24. Our parental preference doctrine stems from the longstanding view that "[t]here is a presumption that the natural affection of a parent for a child will insure the faithful execution of the trust which he holds as natural guardian." *Bioni v. Haselton*, 99 Vt. 453, 458, 134 A. 606, 608 (1926). This accords with the fundamental premise — reaffirmed in *Boisvert* — that a parent's right to care for his children is a fundamental liberty interest protected by both the United States Supreme Court and this Court. 173 Vt. at 292, 796 A.2d at 1108; see *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest . . . of

parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court."); see also *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (reaffirming parents' fundamental liberty interest in care, custody, and control of children, even when they have not been model parents). In *In re S.B.L.*, we emphasized the constitutional right of fit parents to custody of their children. 150 Vt. 294, 305, 553 A.2d 1078, 1085 (1988) ("We conclude therefore that granting guardianship to a third person in preference to a parent who has demonstrated a commitment to parenthood based solely on a judicial determination of the best interests of the child — without first requiring the third party to demonstrate that the parent is unfit — denies the natural parent due process of law."). We had earlier concluded that proving a parent to be "unsuitable" requires showing that "the child has been abandoned or abused by the parent, or that the child is without proper parental care or subsistence, education, medical, or other care necessary for his well-being." *Rutherford v. Best*, 139 Vt. 56, 61, 421 A.2d 1303, 1306 (1980).

■■■ ¶ 25. Under *Boisvert*, the superior court was entitled to hold a hearing and inquire into the best interests of K.M.M. 173 Vt. at 292, 796 A.2d at 1108. The court erred, however, by placing the burden of proof on father to show why it is in the best interests of the child to be returned to his custody. Under *Boisvert*, father was entitled to the presumption that K.M.M.'s best interests lay with him. *Id.* at 291, 796 A.2d at 1107. It was grandfather's burden to rebut the presumption in favor of father, *id.*, and he failed to do so. Indeed, the court found that it was in K.M.M.'s best interests to deny grandfather's termination of parental rights petition because father was ready, able, and willing to assume custody. The court's primary reasoning for denying father's motion — that K.M.M. is well-adjusted to her current home and that she trusts and has been well cared for during the guardianship — is insufficient to overcome father's parental presumption. Otherwise, we would tread unconstitutionally on father's fundamental right to parent his child. *Boisvert*, 173 Vt. at 292, 796 A.2d at 1108. Although grandfather argues that different facts support the view that father should not assume custody, the court's findings are supported by credible evidence. Based on its findings, the court concluded that the conflict between the parties was responsible for the many difficulties father had in assuming a larger parenting

role with K.M.M., not father's deficiencies as a parent. The recent cooperation between father and grandfather, as evidenced by their successful implementation of the visitation plan and voluntary visiting over the holidays last year, indicates that father and grandfather can reduce the impact of their difficult relationship on K.M.M. The court's findings suggest that collaboration among the many loving family members in her life would likely significantly contribute to K.M.M.'s well-being and lessen her anxiety. Consistent with our decision in *Boisvert*, the absence of findings that overcome the parental preference calls for termination of grandfather's guardianship.

¶ 26. Perhaps the most troubling aspect of this case is that the custody dispute over K.M.M. remained in probate court for seven years. This is one issue on which the parties agree. We now decide that father's constitutional right to custody and, presumptively, K.M.M.'s best interests dictate a prompt return of custody to father. We affirm the superior court's denial of grandfather's motion to terminate parental rights and reverse its denial of father's motion to terminate grandfather's guardianship. We remand to the superior court to exercise its discretion to effectuate a transfer of custody to father within an appropriate time.

*Affirmed as to the order denying termination of father's parental rights. Reversed as to the order denying termination of grandfather's guardianship and remanded to the superior court for an order transferring custody to father within an appropriate time as determined by the sound exercise of its discretion.*