NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2026 VT 4

Nos. 25-AP-114 & 25-AP-134

| | |
|---|---|
| In re K.P. | Supreme Court |
| | On Appeal from Superior Court, Lamoille Unit, Family Division Caledonia Unit, Probate Division |
| In re Adoption of K.P. | Lamoille Unit, Civil Division |
| | November Term, 2025 |

Robert R. Bent, J. (Ret.) (Family Division); Annette Lorraine, J. (Probate Division); and Benjamin Battles, J. (Civil Division)

Kurt M. Hughes of Tarnelli & Hughes Family Law, PLLC, Burlington, for Appellants.

B. P., Pro Se, Johnson, Appellee.

PRESENT: Reiber, C.J., Eaton and Cohen, JJ., and Fenster and Thibault, Supr. JJ., Specially Assigned

¶ 1. **REIBER, C.J.** This appeal concerns parental rights to minor child K.P. Petitioners, K.P.'s mother and her husband S.A., appeal the family division's order denying their petitions to terminate the parental rights of respondent, K.P.'s father, and to permit S.A. to adopt K.P. Petitioners also appeal the civil division's dismissal of their appeal from the family division's decision to that court. We conclude that the civil division correctly dismissed petitioners' appeal to that court for lack of jurisdiction and that the evidence supported the family division's decision denying the termination petition. We therefore affirm both decisions.

## I. Facts

¶ 2.     In September 2019, the Lamoille family division issued a final order of divorce awarding mother sole legal and physical rights and responsibilities to K.P. and providing that father would have contact with K.P. twice a week.  Mother subsequently married S.A.  In May 2021, S.A. and mother filed a pro se petition in the Caledonia probate division to allow S.A. to adopt K.P., who was then four years old.  Father was not initially served with the petition, and nothing occurred in the adoption case until August 2023, when mother filed a petition to terminate father's parental rights in the probate case and finally served father.  At that point, the Caledonia probate division appointed counsel for father.  The following month, father filed pro se motions in the Lamoille family division to enforce the final order on parent-child contact and to modify parent-child contact to give him equal time with K.P.

¶ 3.     The record shows that mother and S.A. retained their own counsel at around this time.  In November 2023, they moved to transfer the adoption proceeding to the Lamoille family division and consolidate it with the existing family case.  The Lamoille family division granted the motion.  The Caledonia probate division then dismissed the probate proceeding.

¶ 4.     When the case was transferred to the Lamoille family division, the family division granted father's probate counsel's request to withdraw.  The family division appointed different counsel for father in the consolidated case in March 2024.  New counsel subsequently moved to withdraw because father was not responding to her requests for information.  At a hearing on the motion, father testified that he had not been able to respond because he was in Maine dealing with the death of his aunt.  The court denied the request to withdraw but warned father that if he failed to cooperate with counsel, it would consider him to have waived his right to counsel.[1]  Father subsequently cooperated with his court-appointed counsel.

---

[1] In the final order denying mother and S.A.'s petition, the family division found that father lied when he told the court that he was unable to appear in person because his aunt died, because

¶ 5. The family division held an evidentiary hearing on the consolidated matter over two days in October 2024 and January 2025, following which it issued a written decision containing the following findings.

¶ 6. Mother and father met in March 2015, when mother was thirty-one and father was twenty-one. They married in June 2015. In August 2016, K.P. was born.

¶ 7. Just before meeting mother, father had enlisted in the Marine Corps. He began experiencing seizures after falling from a training scaffolding. The Marine Corps did not believe father's reports of seizures and discharged him in August 2015. The court found, in part based on mother's testimony, that father experienced intermittent seizures through 2022, after which the seizures stopped.

¶ 8. After father returned home to Vermont, he and mother rented a home in Morrisville. He obtained various jobs but was not able to maintain employment. The court found that father's seizures affected his ability to work, although they were not the sole reason for his inability to stay employed. Rather, the court found that father appeared to be depressed and that his struggles were "more likely than not, attributable to mental health dysfunction of some type."

¶ 9. After K.P.'s birth, the family moved repeatedly. They lived with mother's parents for a time. Mother was K.P.'s primary caregiver, although father did provide some care when K.P. was an infant. Mother worked as a phlebotomist at a hospital. While she was at work, K.P. went to daycare in Morrisville with mother's sister.

¶ 10. Mother and father's relationship deteriorated after K.P.'s birth. They argued about father's belief that mother was seeing other men. Father was often moody and would leave to stay with his friends. The court found that father was "verbally volatile" toward mother, but she did

he admitted at trial that his aunt was still alive. However, the court concluded that this "failure of candor" did not affect its assessment of father's parental fitness or desire to redevelop his relationship with K.P.

3

not report that he was violent. Father did not engage in substance abuse or criminal behavior. The parties filed complaints for relief from abuse against each other in 2017. Mother did not pursue her complaint and father's was dismissed. Mother eventually asked father to leave their home because he was not regularly employed or actively parenting K.P. and was difficult to be with.

¶ 11. In November 2018, mother met S.A. Mother filed for divorce in December 2018. At that time, mother and father both lived in Morrisville.

¶ 12. Initially, mother and father had joint parental rights under a temporary order issued in February 2019. Mother soon moved to modify the order due to father's living situation. Father lacked stable housing after he and mother separated. He lived in his car from April to December 2019. He worked for a lawn-care service and at a gas station. Mother's court filings indicated that at that time, father was seeing K.P. somewhat regularly.

¶ 13. In September 2019, the Lamoille family division issued a final order awarding sole legal rights and responsibilities for K.P. to mother. Father was to have visits twice a week for four hours. The order anticipated that father would pick K.P. up from daycare for the visits and return him to daycare afterward. Father admitted that in September 2019, he was unable to provide more care for K.P. due to his unstable living situation and work schedule. He also lacked a working vehicle and did not obtain one until 2020.

¶ 14. Father only had a few visits with K.P. after the order issued. He and mother had an argument about whether K.P. should be returned to daycare after visits. Shortly afterward, mother withdrew K.P. from the daycare. By then, she and S.A. had moved to St. Johnsbury. Mother and S.A. became engaged in October 2019.

¶ 15. Father had some visits with K.P. in St. Johnsbury in September and October 2019. Father traveled using public transportation and the visits took place in public spaces. In October 2019, at mother's request, K.P. stayed overnight with father at a friend's house. There were no issues with the visit, which turned out to be father's last extensive in-person contact with K.P.

4

Father subsequently had some phone calls with K.P. and mother sometimes brought K.P. to the gas station where father worked for brief visits.

¶ 16. Father and mother communicated primarily through text messages and occasional phone calls. They sent a series of messages to each other in the spring of 2020. Father spoke lovingly of K.P. In April 2020, he bought some clothes for K.P. At that time, K.P. recognized that father was his father. The court found that the COVID-19 lockdowns impeded father's contact with K.P.

¶ 17. The communications between mother and father ended in June 2020 when mother asked to change K.P.'s last name to reflect her marriage to S.A. The court found based on the timing and change in tone of mother's messages that her "marriage with [S.A.] and their likely discussions solidified her resolve to see [father] cut loose from K.P." The last time father spoke to K.P. was in June 2020.

¶ 18. Father did not send K.P. birthday or holiday cards or presents. He tried to call K.P. on his birthday, but mother told him K.P. was out with S.A. Neither party attempted to reschedule the call. Father posted messages on Facebook in August 2022 and 2024 celebrating K.P.'s birthday. The court found that "the posts reflect that [father] had some mindfulness about his son."

¶ 19. In February 2021, S.A. sent father a text message criticizing him for his lack of contact with K.P. and telling him that K.P. now regarded S.A. as his father. S.A. criticized father for not going back to court to enforce his rights. Father replied that he had something up his sleeve, apparently referring to the Indian Child Welfare Act (ICWA), which does not apply in this case.[2]

¶ 20. In April 2021, mother and S.A. went to the gas station where father worked to purchase some items. Father was unaware that K.P. was outside in mother's car. Afterward, S.A.

---

[2] The court found that father had recently become a member of the Missisquoi Abenaki Tribe and engaged in tribal events. His aunt is chief of the tribe. The Abenaki are not a federally recognized tribe and the parties agreed that the ICWA does not apply in this case.

sent a Facebook message to father stating, "Dude your such a turd. You were ten feet away from [K.P.] and didn't even ask about him. You're even more of a shit bag then we thought." Father responded that he was unable to go outside because he was working and S.A. could have brought K.P. in. S.A. asked if father wanted them to return when father got out of work, then went on, "I'm his dad not you! And I wouldn't bring him in to see a low life line like you anyway, where were you for his birthday Christmas or any hook for that matter!"[3] Father responded that he was still K.P.'s father.

¶ 21. Father sometimes blocked S.A. from communicating with him on Facebook. Mother also blocked father from communicating with her and told him to communicate with S.A. The court found no evidence that father was able to directly contact mother by phone.

¶ 22. Father eventually remarried and had two children with his new wife. The family lived in Johnson in a mobile home owned by father's wife. The court found that father's functioning had improved since the period when he was married to mother. When father's wife was pregnant with their first child, mother suggested that father allow K.P. to be adopted by S.A.

¶ 23. Father testified that he went to the courthouse on several occasions to obtain help with his parental rights but court staff were unhelpful. The court did not credit father's assertion that court staff told him they would not help him. The court concluded that father "has some processing deficits which impaired his ability to understand how to effect changes in his relationship with his son," and that "an overlay of depression or something like it interfered with his ability to initiate formal charges." The court found father did not have the resources to hire an attorney.

¶ 24. Father had been employed at a ski resort since October 2024. He regularly paid child support for K.P. in 2020, and more intermittently in 2021. He paid nothing in 2022, paid

---

[3] Spelling and grammatical errors are in the original text.

6

three months in 2023, and then paid nothing until October 2024. The court found that the timing of the payments likely reflected amounts withheld from father's paycheck by law during periods of employment. Father paid $5000 in child support in January 2025 but remained in arrears.

¶ 25. At the time of the evidentiary hearing in family division, mother's husband S.A. was thirty-three years old and in good health. He was a member of the Vermont National Guard and worked as a corrections officer in St. Johnsbury. He had several children from a previous relationship and two children with mother. In addition to those two children, K.P. and mother's daughter from a prior relationship lived with mother and S.A. S.A. and K.P. were close. S.A. had acted as a parent to K.P. and K.P. regarded S.A. as his parent. K.P. did not appear to remember father. Mother and S.A. had made no effort to maintain a bond between K.P. and father. K.P. was well-adjusted and did not have any learning or emotional problems.

¶ 26. The family court found that mother and S.A. had met their initial burden of demonstrating that father did not exercise parental responsibility over K.P. during the six months immediately preceding the adoption petition.[4] However, it found father had shown by a preponderance of the evidence that he had good cause, throughout the pendency of the proceeding, for failing to exercise parental responsibility. The court reasoned that mother and S.A. had interfered with father's relationship with K.P. by failing to acknowledge father's existence to K.P., removing K.P. from his daycare in Morrisville, blocking father's communications without justification, and refusing to allow father to visit K.P. The court found that father's work schedule,

---

[4] It is clear from the statutory scheme that the six-month period referenced in 15A V.S.A. § 3-504(a)(2) is measured from the filing of the termination petition, rather than the adoption petition, as all references in part 5 of Article 3 of the Adoption Act clearly refer to the termination petition. 15A V.S.A. §§ 3-501-3-506; cf. In re J.C., 169 Vt. 139, 142, 730 A.2d 588, 590 (1999) (assessing evidence of parents' exercise of responsibilities during six months prior to termination petition). Here, the evidence supports a finding that father did not exercise parental responsibility over K.P. for six months prior to the filing of the termination petition in April 2023. The court's error in measuring the period from the filing of the adoption petition is therefore not a basis for reversal.

7

lack of stable housing or a vehicle, and seizures and apparent mental-health issues also created significant obstacles to his ability to parent. The court noted that father's younger children were aware that K.P. was their half-sibling, showing that father was not indifferent to K.P. Father had also paid child support for K.P.

¶ 27. Because father had shown good cause for not exercising parental responsibility, the court went on to assess whether there was clear and convincing evidence of any of the factors set forth in 15A V.S.A. § 3-504(b)(1)-(4). The court found that the first and third factors—whether father assumed parental responsibility once he no longer had good cause for not doing so, and whether father had a relationship with another person who would adversely affect K.P.—did not apply. Id. § 3-504(b)(1), (3). The court further found that the evidence did not show that father would be unable or unwilling to provide K.P. with appropriate care and affection, id. § 3-504(b)(2), or that placing K.P. in father's care would risk causing K.P. substantial physical or psychological harm due to father's unfitness as a parent, id. § 3-504(b)(4).

¶ 28. The court further concluded that terminating father's rights would not be in K.P.'s best interests. It found that father could likely resume the prior parent-child contact schedule if permitted to do so, because father's life had stabilized and he appeared to be a loving parent to his other children. The court found it would be beneficial for K.P. to have a relationship with father and K.P.'s half-siblings. The court acknowledged that reintroducing father to K.P. would "upset [his] status quo" and that father had not historically played a constructive role in K.P.'s life, but concluded that "the well-established parental preference doctrine favors [father] retaining his parental rights unless and until he is shown to be an unfit parent." See In re K.M.M., 2011 VT 30, ¶ 25, 189 Vt. 372, 22 A.3d 423 (explaining that in termination proceeding under 15A V.S.A. § 3-504, parent is entitled to presumption that it is in child's best interests to have parent exercise responsibility over child, and it is petitioner's burden to rebut presumption).

¶ 29. The court therefore denied the petition to terminate father's parental rights and S.A.'s request to adopt K.P. It granted father's motion to modify the existing parent-child contact order. It ordered mother to retain a therapist to prepare K.P. for reintroducing father into his life, followed by gradual reintroduction of contact over a period of a year. It indicated that the contact order was temporary and that it would set a hearing to see if adjustment was required in March 2026.

¶ 30. Petitioners filed a notice of appeal to this Court. They also filed a notice of appeal to the Lamoille civil division pursuant to Vermont Rule of Civil Procedure 72 and 12 V.S.A. § 2553. The civil division dismissed the latter appeal on the ground that it lacked appellate jurisdiction over the family division's decision. Petitioners then appealed to this Court from the civil division's decision. This Court granted petitioners' request to consolidate the two appeals for purposes of decision.

II. Appeal to Civil Division

¶ 31. Petitioners first argue that the Lamoille civil division erred in dismissing their appeal to that court. They argue that because their petitions for adoption and termination of parental rights originated in the probate division, 12 V.S.A. § 2553 gives them the right to appeal the family division's order to the civil division.

¶ 32. Our role in interpreting statutes is to effectuate legislative intent. Ketchum v. Town of Dorset, 2011 VT 49, ¶ 10, 190 Vt. 507, 22 A.3d 500. If the intent of a statute is clear from the plain language, we will enforce it. In re Appeal of Carroll, 2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990. However, "if doubts exist," we will seek the true legislative intent by considering "the whole statute, the subject matter, its effects and consequences, and the reason and spirit of the law." Id. (quotation omitted).

¶ 33. Section 2553 of Title 12 provides: "The Civil Division of the Superior Court shall have appellate jurisdiction of matters originally within the jurisdiction of the Probate Division of

9

the Superior Court, except as herein otherwise provided." See also 4 V.S.A. § 31(2) (stating civil division has appellate jurisdiction over "causes, civil and criminal, appealable to the court"). Here, the adoption and termination petitions were initially filed in the probate division pursuant to Vermont's Adoption Act, which gives the probate division jurisdiction over such proceedings. See 15A V.S.A. § 3-101 (giving probate division jurisdiction over proceeding for adoption of minor); id. § 3-206 (stating that "[a]n action for termination of the legal relationship of parent and child pursuant to Part 5 of this article may be joined with a proceeding for adoption"). Petitioners argue that because the adoption and termination petitions were originally filed in the probate division, § 2553 gives them the right to appeal the consolidated cases in the family court to the civil division and have a de novo trial before that court. See Reporter's Notes, V.R.C.P. 72(d) (stating appeal from probate court is by trial de novo in civil division); Whitton v. Scott, 120 Vt. 452, 458, 144 A.2d 706, 709-10 (1958) (explaining under prior version of law that natural parents had right to de novo appeal in county court from adoption decree issued by probate court).

¶ 34.    We conclude that petitioners' proposed procedure in this case is inconsistent with legislative intent as expressed in Title 12 and elsewhere. It is true that the adoption and termination proceeding originated in probate division. However, at petitioners' request the proceeding was transferred to the family division and consolidated[5] with the preexisting divorce action pursuant to 15A V.S.A. § 3-207, which states:

> If another action or proceeding concerning the adoptee is pending in the Family Division of the Superior Court of this State during the pendency of a proceeding for adoption under this title, then either court in which an action is pending, on its own motion or on motion

---

[5]    In civil procedure, to "consolidate" typically means "[t]o combine, through court order, two or more actions involving the same parties or issues into a single action ending in a single judgment." Consolidate, Black's Law Dictionary (12th ed. 2024); see Yardley v. Rutland R.R. Co., 103 Vt. 182, 185, 153 A. 195, 196 (1931) (distinguishing situations where cases are tried together from "actual consolidation, where several suits are merged and thereafter proceed to judgment as a single action"). Here, the probate and family proceedings were not simply tried together but were actually consolidated into a single action—the family proceeding—and the probate case was dismissed.

10

of any party to the proceeding for adoption, may request that the proceeding for adoption be consolidated with the Family Division of the Superior Court proceeding. Such a consolidation may be ordered by the Family Division of the Superior Court receiving the adoption action, pursuant to 4 V.S.A. § 455.

See also 4 V.S.A. § 455(b) (stating family division shall order transfer of adoption action filed in probate division "if it finds that the identity of the parties, issues, and evidence are so similar in nature to the parties, issues, and evidence" in pending family proceeding that transfer would expedite resolution or best serve interests of justice).

¶ 35. Because the case was consolidated with the family proceeding, the probate division never ruled on the merits of the adoption or termination petitions. Instead, it ordered dismissal of the probate proceeding in March 2024 after the case was transferred to the family division. The family division then held an evidentiary hearing on all pending issues and issued its final order denying the petitions to terminate and adopt and granting father's motions to enforce and modify parent-child contact.

¶ 36. In general, this Court, not the civil division, has appellate jurisdiction over family division decisions. See 4 V.S.A. § 2(a) ("The Supreme Court shall have exclusive jurisdiction of appeals from judgments, rulings, and orders of the Superior Court . . . unless otherwise provided by law."). As the civil division observed in its order dismissing petitioners' appeal to that court, nothing in the Adoption Act, Title 12, or Vermont Rule of Civil Procedure 72 indicates that a party to an adoption proceeding that has been consolidated with a family case may appeal to civil division from the family division's final decision.

¶ 37. Moreover, although 12 V.S.A. § 2553 grants the civil division appellate jurisdiction over most probate matters, the right to appeal a probate decision is set forth in a separate statute, § 2555. That provision states: "Except as otherwise provided, a person interested in an order, sentence, decree, or denial of a Probate Division of the Superior Court, who considers himself or herself injured thereby, may appeal therefrom to the Civil Division of the Superior Court." 12

11

V.S.A. § 2555. The plain language of the provision gives an aggrieved party the right to appeal an order of the probate division to the civil division. The only "order . . . of a Probate Division" in this case was the March 2024 order dismissing the probate proceeding after the family division granted petitioners' motion to transfer and consolidate with the matter in that court. Petitioners did not appeal that decision. Subsequently, after consolidation, the family division's March 2025 order denying the petitions for termination and adoption was not an order of the probate division. While petitioners acknowledge the existence of § 2555, they do not explain why we should depart from its plain language, which clearly does not give petitioners the right to appeal a family division order to the civil division.

¶ 38. Nor do we see a compelling policy reason to interpret the statute in the manner proposed by petitioners. The provision for appeal de novo to the civil court from probate proceedings has long existed under Vermont law. See, e.g., Whitton, 120 Vt. at 457-58, 144 A.2d at 709 (describing appeal procedure prior to unification of court system). The procedure likely evolved because probate proceedings were relatively informal, with somewhat looser procedural and evidentiary protections than civil cases. See Reporter's Notes, V.R.P.P. 43 (noting key differences between probate and civil rules regarding hearings that "reflect the informal nature of probate proceedings"). Sections 2553 and 2555 ensure that aggrieved parties have an opportunity to have a formal trial of the issues in a probate case. The concern underlying § 2553 and § 2555 is inapplicable when a probate proceeding is transferred to family division, however, because the family division generally follows the same rules as the civil division when it hears evidence. See V.R.F.P. 4.0(a)(2) (stating rules of civil procedure generally apply in family proceedings). Thus, allowing an appeal from the family division to the civil division would not necessarily provide petitioners with better procedural protections or ensure a more rigorous examination of the evidence. Petitioners do not deny that they had a full and fair opportunity to present their case in the family division; they simply disagree with the result.

12

¶ 39. For these reasons, we conclude that the civil division properly dismissed petitioners' appeal to that court from the family division's final order.

### III. Petition to Terminate Parental Rights

¶ 40. We therefore turn to petitioners' direct appeal from the termination decision. On appeal from a decision granting or denying a petition to terminate parental rights, we review the trial court's factual findings for clear error, meaning that we will affirm the findings "if they are supported by credible evidence, even if contrary evidence exists." In re K.M.M., 2011 VT 30, ¶ 14. "The court's conclusions will stand if supported by the factual findings; conclusions not supported by the findings, however, cannot be sustained." Id.

¶ 41. Section 3-504 of Title 15A sets forth the legal standard for terminating parental rights in the context of an adoption proceeding. The court must first find that one of the threshold criteria for termination is met. See 15A V.S.A. § 3-504(a) (setting forth four potential bases for termination). Here, petitioners alleged, and the family division found, that father "did not exercise parental responsibility for a period of at least six months immediately preceding the filing of the petition." 15A V.S.A. § 3-504(a)(2). This finding is not challenged on appeal.

¶ 42. Rather, father argued below, and the court found, that father had good cause for not exercising parental responsibility. Section 3-504(b) provides that if the respondent proves by a preponderance of the evidence that he had "good cause" for not exercising parental responsibility,

> the court may not terminate the respondent's parental rights to a minor except upon a finding by clear and convincing evidence that any one of the following grounds exists and that termination is in the best interests of the minor:
>
> (1) Once the respondent no longer had good cause for not complying with the requirements of subdivision (a)(1) or (2) of this section, he or she failed to assume parental responsibilities as promptly and fully as circumstances permitted.
>
> (2) The respondent, after being afforded a reasonable opportunity to do so, would not have the ability and disposition to:

(A) provide the child with love, affection, and guidance;

(B) meet the child's present and future physical and emotional needs; or

(C) provide the child with adequate food, clothing, medical care, other material needs, education, and a safe environment.

(3) At the time of the hearing, the respondent has a relationship with another person who would significantly and adversely affect the child.

(4) Placing the minor in the respondent's legal or physical custody would pose a risk of substantial harm to the physical or psychological well-being of the minor because the circumstances of the minor's conception, or the respondent's behavior during the pregnancy, or since the minor's birth indicates that he or she is unfit to maintain a relationship of parent and child with the minor.

Id. § 3-504(b).

¶ 43.    "[T]he statute requires the probate court to consider 'all relevant factors' in determining whether respondents have demonstrated good cause for not exercising parental responsibilities." In re J.C., 169 Vt. 139, 143, 730 A.2d 588, 591 (1999) (quoting 15A V.S.A. § 3-504(a)(2)).  As we observed in J.C., this is a fact-specific inquiry that is for the trial court, as factfinder, to resolve. Id.

¶ 44.    Here, the family division found that father had demonstrated good cause for his failure to exercise parental responsibility for two primary reasons.  First, it found that mother and S.A. had interfered with father's relationship by removing K.P. from his daycare in Morrisville without consulting father to alter the visitation plan, blocking father's communications, and refusing to allow father to visit when he did attempt to do so.  Second, it found that father's lack of a vehicle and housing during the period after the divorce and his seizures and other potential mental-health issues created significant obstacles to his ability to parent K.P.

¶ 45.    The family division's findings are supported by evidence in the record and therefore are not clearly erroneous.  See In re T.R., 163 Vt. 596, 596-97, 653 A.2d 777, 779 (1994) (mem.) (stating this Court will uphold trial court's factual findings "if, when viewed in the light most

14

favorable to the prevailing party, they are supported by reasonable or credible evidence, even if contrary evidence exists" (quotation omitted)). Mother conceded that she unilaterally removed K.P. from the daycare in Morrisville. She was aware that father did not have a car or housing at that time and relied on a friend to visit K.P. in St. Johnsbury. Father testified that after his final overnight visit with K.P. in October 2019, he asked to see K.P. but mother would make excuses, stating that they were not home or that K.P. was out with S.A. Father continued to have phone and video calls with mother and K.P. until June 2020, when mother asked to change K.P.'s last name.[6] Father testified that he did not initially try to enforce his right to contact "because I was couch surfing. I was depressed. I was still dealing with my seizures, trying to get those in order. I'm still trying to just bounce back after the divorce. And I just—I had no clear direction on what to do. I felt lost." Father testified that around this time, he was hospitalized for suicidal ideation.

¶ 46. Father and mother continued to have occasional communications on Facebook Messenger until November 2022, when father asked mother to "tell my son that I said happy Thanksgiving." Mother responded that father had missed K.P.'s birthday and every other holiday and wrote, "I'm not about to tell him anything from you, the only dad he's ever known his [sic] here for every milestone of his life!" Mother told father not to message her again. A few days later, father texted, "Can I talk to my son now." Mother responded, "Umm it's 8 pm he's sleeping he has school! And no I'm not allowing it you have had 3.5 years to talk to him." After several messages back and forth, mother stated that she was blocking father and told him to communicate through S.A. "from now on!" However, S.A.'s communications with father were taunting and belittling and did not encourage father's contact with K.P. Father testified that he did not call K.P. because he did not know mother's cell phone number. He did not go to mother's house in St.

---

[6] Father testified that these communications occurred through the Facebook Messenger app.

Johnsbury because he was worried that she would report him for trespassing and that S.A. would beat him up.

¶ 47. On cross-examination, mother did not deny that she had blocked father's communications since November 2022. She responded, "He can contact the court to file motions to see his son, and he chose not to." Father testified that he went to the Lamoille family division to seek help but did not file anything because "they just didn't know how to help me." He could not afford a lawyer. After the termination petition was filed, and he was appointed counsel, he moved to enforce and modify the parent-child contact order. This evidence supports the trial court's findings that mother and S.A.'s interference, along with father's significant personal struggles, constituted good cause for his failure to exercise parental responsibility for K.P.

¶ 48. Petitioners do not appear to dispute the trial court's general observations that interference by a custodial parent with the noncustodial parent's contact with the child, or the noncustodial parent's poverty or other significant personal issues, may constitute good cause for failure to exercise parental responsibility. See In re K.M.M., 2011 VT 30, ¶ 20 (affirming denial of petition to terminate father's parental rights despite father's limited visits and communications with child over nine years because "father's limited involvement over the years was, in large part, due to grandfather's refusal to allow increased contact between father and daughter"); see also In re Adoption of Holcomb, 481 N.E.2d 613, 620 (Ohio 1985) (holding under Ohio law that "significant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication," may constitute justifiable cause for noncustodial parent's failure to communicate with child); In re Adoption of C.A.P., 869 N.E.2d 214, 219 (Ill. App. Ct. 2007) (stating that in deciding whether parent abandoned child for purposes of termination petition under Illinois law, courts should consider "the parent's difficulty in obtaining transportation to the child's residence, the parent's poverty, the actions and statements of others that hinder or discourage visitation," and "whether the parent's

16

failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference"). As the court observed, to hold otherwise would allow a custodial parent "to engineer 'abandonment' by the non-custodial parent simply by refusing to allow visitation."

¶ 49. Rather, petitioners argue that the court erred in finding good cause because the record showed that father's seizures and mental health appeared to have stabilized by November 2022 but father did not attempt to contact K.P. or vigorously pursue legal action to enforce his parental rights between then and April 2023. We disagree that there was no evidence to substantiate the court's finding of good cause during this period. The court found that mother, without justification, had blocked father on Facebook Messenger, cutting off their previous method of communication. The court noted that father could have communicated with S.A., but did not fault him for being reluctant to continue their increasingly acrimonious interactions. The court also acknowledged that father did not "d[o] everything he could have done to use the court system," but found this to be "a function of whatever dysfunction has infected so much of his life during those periods." Given the record of father's struggles to stay housed and maintain a living, and the court's own observations of father during the termination proceeding, the court could reasonably infer that father had limited capacity to navigate the legal system without assistance. Moreover, petitioners do not challenge the court's finding that father continued to have limited financial resources during that period, which also presented a significant obstacle to seeking legal relief. This finding is supported by the record and by the fact that father immediately filed a motion to enforce the parent-child contact order once he was appointed counsel. While petitioners would have us reach a different conclusion based on the evidence, "the credibility of the witnesses, the weight and sufficiency of the evidence and its persuasive effect are questions for the trier of fact, and its determination must stand if supported by credible evidence, even though there may be inconsistencies or substantial evidence to the contrary." Stamato v. Quazzo, 139 Vt. 155, 158, 423 A.2d 1201, 1203 (1980).

17

¶ 50. Because the trial court found good cause, it could not terminate father's parental rights unless it found by clear and convincing evidence that one of four additional statutory criteria was satisfied and termination was in K.P.'s best interests. 15A V.S.A. § 3-504(b). Petitioners only appear to challenge the court's finding that the first factor—whether father "failed to assume parental responsibilities as promptly and fully as circumstances permitted" once he no longer had good cause to do so—was not satisfied. Id. § 3-504(b)(1). Again, this finding is not clearly erroneous. Mother and S.A.'s position throughout the proceeding was that father had no right to contact K.P. and there is no evidence that father would have been able to resume contact without a court order. As noted above, the record shows that after father was appointed an attorney in September 2023, he quickly took steps to assert his parental rights by responding to the termination petition and filing a motion to enforce the parent-child contact order. These facts support the court's conclusion that § 3-504(b)(1) was not satisfied here. Petitioners do not challenge the court's findings that none of the other factors were satisfied.

¶ 51. Petitioners also challenge the court's ruling that termination of father's parental rights was not in K.P.'s best interests. They argue that the court failed to consider whether father would be able to resume a parental role within a reasonable time as measured from K.P.'s perspective. They further claim that the court erred in requiring petitioners to prove that father was unfit. We do not reach these arguments because under the plain language of § 3-504(b), the court may not terminate parental rights unless it finds that one of the grounds enumerated in § 3-504(b)(1)-(4) exists. Because it found that this prerequisite was not satisfied, the family division could not grant the termination petition in this case, regardless of its best-interests analysis.[7]

---

[7] We note, however, that the court's analysis of the resumption-of-parental-duties factor was based on father's ability to resume the contact to which he was entitled under the 2019 divorce order, which gave father a total of eight hours a week. The court did not suggest that father would be able to become K.P.'s primary caregiver or to dramatically increase his parenting time. The court also accurately recited Vermont case law when it stated that in a proceeding where a third party seeks to terminate parental rights, the child's adjustment to their current home and bond with

¶ 52.    In closing, we emphasize that it is the trial court's unique role to assess witness credibility and demeanor and to weigh the evidence.  Payrits v. Payrits, 171 Vt. 50, 53, 757 A.2d 469, 472 (2000).  "That a different weight or conclusion could be drawn from the same evidence may be grist for disagreement, but does not show an abuse of discretion."  Knutsen v. Cegalis, 2011 VT 128, ¶ 13, 191 Vt. 546, 35 A.3d 1059.  The family division's findings in this case are supported by the evidence; we therefore may not disturb its decision.

Affirmed.

FOR THE COURT:

_____
Chief Justice

---

their current caregiver(s) are not sufficient to overcome the presumption that it is in the child's best interests for their biological parent to exercise parental rights and responsibilities, absent a showing that the parent is unfit to care for the child.  In re K.M.M., 2011 VT 30, ¶ 25.